# EXHIBIT K

# CAVIT v. CAVIA
# LIKELIHOOD OF CONFUSION STUDY

# A STUDY CONDUCTED FOR
# GRIMES & BATTERSBY, LLC

### May 27, 2011

**Dr. Dan Sarel**

Marketing Research – Consultation – Strategic Planning
10100 Southwest 142nd Street
Miami, Florida 33176
305-251-6005

# TABLE OF CONTENTS

|  | Page |
|---|---|
| Background & qualifications | 3-4 |
| Scope of assignment & objectives | 5 |
| Methodology | 6-19 |
| Findings | 20-25 |
| Conclusions | 26 |
| Appendix A: Dr. Sarel's Curriculum Vitae & list of legal cases | 27-40 |
| Appendix B: Questionnaires | 41-48 |
| Appendix C: Interviewers research instructions | 49-50 |
| Appendix D: Presented Stimuli | 51-59 |

## BACKGROUND & QUALIFICATIONS

1. I, Dr. Dan Sarel, am a tenured associate professor of marketing in the School of Business at the University of Miami and an active marketing consultant specializing in brand and trademark management, communication strategies and marketing research. I have provided marketing expert testimony in legal cases involving trademark infringement, deceptive advertising and other marketing issues. I have served as an expert witness for plaintiffs and defendants. I have been accepted as a marketing expert both in Federal and State Courts. Market research studies that I have conducted have been admitted into evidence.

2. I hold a BA in Economics (1972) and MBA (1974) from the Hebrew University. In 1978 I received a Doctorate in Business from Harvard University specializing in Marketing. For over 30 years I have been involved in the marketing and marketing research fields as an academic researcher, educator, consultant and research practitioner.

2. In my business experience, academic research, and consulting activities I have designed, conducted, analyzed and been responsible for hundreds of marketing studies. My experience includes all types of qualitative and quantitative marketing research and marketing information systems.  I have been responsible for all phases of marketing studies including but not limited to study design, universe specifications, sampling, questionnaire design, data inputting, statistical analysis and reporting.

3.  For the last 33 years I have been teaching marketing courses to undergraduates, graduates and executives. These courses included: Marketing Management, Advertising & Communication Management, Marketing Research, Consumer Behavior, Services Marketing and other electives. I'm actively involved in designing and teaching Executive Education programs in the United States, the Caribbean, South America and Europe. Participants in these programs have included executives from leading corporations such as American Express, AT&T, Bank of America, Bacardi, Baptist Hospital, Baxter,

3

Cordis, Disney, Wachovia, GE, HP, Martin Marietta, Merck, Motorola, Nortel, Publix, Sony, Ricoh, Ryder, Texaco, Visa and Xerox to name a few.

4.  As an academic researcher, I have published many articles in the leading academic publications. My writings have appeared in the Trademark Reporter, Journal of Marketing, Journal of the Academy of Marketing Science, California Management Review, Journal of Services Marketing, Journal of Advertising, Journalism Quarterly, the Economist Travel and Tourism Analyst, International Journal of Business Logistics, Journal of Financial Services Marketing, Journal of Health Care Marketing, Journal of Personal Selling and Sales Management, Intellectual Property & Technology Law Journal and other publications. I serve on the editorial board of the Journal of Financial Services Marketing and am the Co-Editor of the special issue on Customer Relationship Management in Banking.

5. As a marketing consultant and a researcher I have been actively involved in marketing consulting with leading national and international corporations. I have worked as an independent consultant as well as a Director of a marketing research firm. I have worked for or conducted studies on behalf of: Citicorp, First Union National Bank, Metro Bank, Mitsubishi Heavy Industries, Hilton Hotels, Saatchi and Saatchi, Miami Heart Hospital, Miami Children Hospital, Physician Corporation of America, CAC/Ramsey, The Palace Group, UltraMedix, The Sterling Group, Orient Express, Cruise Line International Association, Royal Caribbean Cruise Line, Royal Viking Cruise Line, Crystal Cruise Line, Norwegian Cruise Line, Transcontinental Rails, Field of Flowers, BBDO, Burson Marsteller, Beber and Silverstein, Tinsely Advertising, Pulte Homes, City of Coral Springs, Doral Golf Resort & Spa, ABC Fine Wine & Spirits, Holland & Knight, 5-Hours Energy, and many other national and international corporations.

6. A copy of my Curriculum Vitae, which includes a list of my publications, is attached as Exhibit A. Also included a representative list of legal cases, I participated in.

4

## SCOPE OF ASSIGNMENT & OBJECTIVES

7. I, Dr. Dan Sarel, have been retained by Grimes & Battersby, LLC, on behalf of PALM BAY INTERNATIONAL, INC. to provide expert opinion on likelihood of confusion and marketing issues pertaining to the following case:

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 10-CV-23464-KING**

**PALM BAY INTERNATIONAL, INC. and**
**CAVIT CANTINA VITICOLTORI CONSORZIO**
**CANTINE SOCIALI DEL TRENTINO SOCIETA**
**COOPERATIVA,**

> **Plaintiffs**

**vs.**

**CORK ALLIANCE, INC., d/b/a SOUTHERN**
**VINES, INC. and HORACIO O. PEIRO**

> **Defendants**

8. The primary goals of the expert report are to:

i. Provide an expert opinion as to the likelihood of confusion between Plaintiff (CAVIT) and Defendant (CAVIA) marks.

ii. Provide expert opinion on marketing, communication and advertising issues related to consumer confusion.

9. The opinions set forth herein are based on a consumer study reported below and background information and documents provided by Plaintiff's counsel, retail store visits and discussions with PBI marketing executives. If additional relevant information becomes available, these opinions may be supplemented.

10. Dr. Sarel has no financial interest in the outcome of this litigation.

5

## METHODOLOGY

### 11. Design Principles And Standards

The present study was designed and conducted in accordance with the established principles of survey research. These principles are consistent with the guidelines for survey research offered in litigation as articulated in the Manual for Complex Litigation, Third Edition[1].   It is important to emphasize that courts have long recognized that the methodology used in survey research involves some degree of compromise between conflicting standards. Surveys ought to produce meaningful, valid and reliable data that help experts form opinions on the issues at hand. The study reported here follows these principles.

### 12. Background

The following observations are based on review of documents provided by Plaintiff's counsel, Internet search, retail store visits and discussions with PBI marketing executives. It is my understanding that Plaintiff, PBI is a Florida corporation.  PBI has been the exclusive U.S. importer, distributor, agent and licensee for CAVIT brand wines since the brand was first imported and sold in the United States in 1979. The CAVIT family of wines have ranked among the most popular and best selling wines in the United States for many years. CAVIT brand wines have been marketed, advertised, distributed widely and continuously in the U.S. since at least as early as 1979. The CAVIT brand wines are very widely distributed throughout the country. CAVIT brand wines are available for sale in almost every outlet that sells alcoholic beverages, in all 50 states and on the Internet. PBI utilizes hundreds of distributors who distribute CAVIT wines to on and off premises locations, including restaurants, liquor stores, grocery stores, supermarkets, hotels, airlines, bars, nightclubs, casinos and wine Internet stores.  PBI devotes significant resources towards marketing, advertising and promoting the CAVIT brand in an effort to build and enhance brand awareness, recognition, preference and loyalty. In its communication campaigns,  PBI has employed multiple media outlets including  print,

---

[1] Manual for Complex Litigation, Third (1995) (Chicago: Federal Judicial Center). See also Shari Seidman Diamond (2000), "Reference Guide on Survey Research," in Reference Manual on Scientific Evidence (Chicago: Federal Judicial Center), pp 221-271).

radio, and television advertising, point of sale signage and displays, sponsorships and events, sweepstakes and contests, promotional merchandise, website and other methods.

According to the complaint, Defendants import and distribute CAVIA brand wines in the United States. Based on Defendant Horacio O. Peiro's answers to Plaintiff's first set of interrogatories, it is my understanding that CAVIA has been first used in commerce in Miami, Florida in September 2005. According to Mr. Peiro, since the introduction in Florida, CAVIA brand wines have been gradually expanding to other states. As of 2011 CAVIA brand wines have been sold in one way or another in 31 states. According to Defendant, CAVIA brand wines have been sold in "hundreds of stores and restaurants". Based on my online search, CAVIA is also available in some wine Internet stores.

Plaintiffs argue that the CAVIA mark is virtually identical to the CAVIT Trademarks in appearance, sound and commercial impression, and is therefore confusingly similar. As a result, Defendants' CAVIA trademark so resembles the CAVIT Trademarks as to be likely to cause confusion.

13. Based on the above mentioned background information, a study was designed to enable Dr. Sarel to render an opinion about the likelihood of confusion between Plaintiff's and Defendant's marks and related marketing issues arising from likelihood of confusion.

14. In general, upon exposure to a mark confusion may arise due to misperceptions about the source of the product displaying the mark or due to misperceptions about association of that mark with other firm through perceived approval, licensing or sponsorship.

In this case upon exposure to Defendant's CAVIA mark, the following three scenarios of confusion could take place:

I.  <u>Defendant's product is perceived to be Plaintiff's product</u>:  Consumers may erroneously believe that CAVIA brand wine is the CAVIT brand wine that they have encountered before (through advertising, prior-purchase, prior

consumption, word-of-mouth recommendation and other communication venues).

II. <u>Defendant's product is perceived to be put out by Plaintiff:</u> Consumers may erroneously believe that Plaintiff is the source of Defendant's product. In this scenario consumers may believe that the name marks are so similar that they had to come from the same source.

III. <u>Defendant's mark is perceived to be approved, licensed or sponsored by Plaintiff:</u> Given the perceived similarity of the names, consumers may erroneously believe that Defendant has been approved, licensed or sponsored by Plaintiff to use the name mark.

15. Courts have long recognized the importance of designing studies that are as representative of market conditions as possible. Often, several study design alternatives could be considered. Studies are never perfect, but some are clearly better than others in enabling the expert to render a valid opinion. In this case, the distinctive market conditions that guide the study design are the current distribution channels employed by Plaintiff and Defendant, the vast number of brands of wine and variety of wines available to consumers at typical distribution outlets and the nature of the consumer buying process. In supermarkets, wine stores, internet stores, restaurants and other points of sale, consumers today typically face a vast array of wine options. Consumers can select from many wine brands and many types of wine. In Florida, for example, Publix Supermarkets have been gradually increasing the amount of shelf space allocated to wines, offering consumers a growing number of choices. Marketing literature suggests that when faced with a large number of options, consumers tend to simplify their decision making process. This simplification behavior is especially likely for time constrained consumers. In categories that consumers are familiar with, they tend to rely on prior experiences and perceptions. A consumer who had a positive experience with a specific brand or heard the name mentioned or recommended is more likely to gravitate toward that brand. Thus, in a typical wine buying scenario, a consumer might be specifically looking for a brand of wine; or while browsing and coming across a familiar brand, be more likely to consider and purchase it.

As discussed above, most wine distribution outlets today carry a very large selection of wine types and wine brands. A consumer who comes across a CAVIA wine brand is very likely to view it as one option among hundreds of options and not side-by-side with CAVIT. Thus, the issue at hand is what will consumers think when they come across a CAVIA wine, when a CAVIT wine is not displayed immediately next to it. The study design employed here captures this phenomenon

16. Several study designs could be considered to measure this phenomenon. One approach is to present Plaintiff's and Defendant products sequentially within a short time interval. After a few minutes Plaintiff's product is removed and respondents are asked the relevant confusion questions. This design leads consumers to pay close attention to the senior mark and to the comparison process. In reality, however, given market conditions and the typical buying behavior, this will not often be the case. Many consumers will tend to focus on Defendant's product (especially if they believe it is Plaintiff's) and are unlikely to directly compare it with Plaintiff's brand. Thus, this design over-exposes respondents to Plaintiff's mark, encourages direct comparison and presents a very short separation period between exposure and questioning. An alternative design may go to the other extreme. Present only Defendant's product and ask the relevant confusion questions. This design, however, makes the measurement of Confusion Scenario I (above) very difficult. Traditional "Source" questions will be especially difficult to interpret. It will be unclear whether respondents are actually referring to Plaintiff's mark or someone else. Thus, the challenge is to design a study without overexposing respondents to Plaintiff's mark yet at the same time enabling an unambiguous interpretation of respondents' answers to confusion questions.  The third alternative design attempts to accomplish these goals by exposing respondents to Plaintiff's mark at a lower level of exposure. Respondents at that point are not fully aware of the purpose of the study or its focus. By showing a set of ads about multiple products that include an ad for Plaintiff's product, this less-direct exposure is accomplished. Only in the next phase is the objective of the study revealed. Then, respondents are presented with photos of Defendant's product and an appropriate control stimulus and are asked the relevant questions. This design ensures that respondents' answers to confusion questions about the

relationship between Defendant's mark and Plaintiff's mark are unambiguous. While solving the unambiguous identification issue, this design may still be presenting the two stimuli too close to each other and therefore underestimate the real level of confusion. Thus, this method could be viewed as a <u>very conservative estimate of likelihood of confusion</u>. In other words, if confusion is likely under this design, the true market confusion is probably higher. Based on the discussion above, the third design was deemed most appropriate and was employed in the study. (Four actual magazine ads, corresponding to the screening questions were employed.) Details are provided below.

17. Study design: First, screened respondents (see respondent selection process in paragraphs 25-28 below) were shown a booklet containing four actual magazine ads (including one for CAVIT). All ads were taken from magazines recently used by CAVIT print advertising campaigns. Second, respondents are told they were considering buying wine at a store or ordering wine at a restaurant. In that scenario they were presented with photos of Defendant's product and a control product. Respondents are given time to evaluate these stimuli and then are asked several traditional likelihood of confusion questions. All three likelihood of confusion scenarios are assessed. If Scenario I takes place (i.e. consumers believe that <u>Defendant is Plaintiff</u>), there is no need to further explore the other scenarios. If consumers don't believe that Defendant's mark is the one they encountered previously, the two other confusion scenarios need to be evaluated. Consumers may believe that Defendant's product is made by Plaintiff, or they may believe that it has been approved, licensed or sponsored by Plaintiff.

18. A within-subject design was developed to provide a better assessment of the likelihood of confusion between Defendant's and Plaintiff's marks. In addition to being asked about CAVIA vs. CAVIT, each respondent was also asked similar questions about the connection between a control mark and CAVIT. The control stimulus used in this study was CATENA, an alternative brand of wine that is very similar to Defendant. Both CAVIA and CATENA come from Argentina, a fact that was clearly visible in the photos, especially for CAVIA. Both photos displayed a Malbec wine. Both had similar white labels. Both brands have short names starting with the letters "CA".

10

It should be noted that the selection of such a similar control creates a very high standard; one can argue even too high. In fact, many studies presented in Court have employed control stimuli that are very different from the disputed marks. Thus, results obtained in this study should be viewed as very conservative estimates of likelihood of confusion.

19. To ensure that positive answers to the similar source questions (Confusion Scenario II) or to the "approved, licensed or sponsored by" questions (Confusion Scenario III), are valid measures of confusion, follow up questions requiring respondents to explain the reasoning for those answers were asked. Thus, respondents who say that Defendant's product comes from the same company advertised in the magazine ad (Plaintiff) are asked to explain why. Similarly, those who see a connection through approval, licensing or sponsorship are asked to explain why. These additional explanations provide the researcher a method for assessing the validity of the answers as true measures of confusion. This methodology is applied in this study.

20. To measure Likelihood of Confusion a multi-step approach was used.

i. Exposure to magazine ads: Qualified respondents were first exposed to four magazine ads. These included one ad for CAVIT and three other magazine ads that appeared recently in magazines used by CAVIT print media campaign.  The other ads included products or services offered by ATT (best coverage worldwide), Celebrity Cruises (indulgence in luxury) and Bel Gioioso (America's favorite fresh mozzarella).  All ads are presented in appendix D. The non-CAVIT ads correspond to the products and services respondents were asked about during the qualification (screening) phase.

Respondents were told:

During the interview I'm going to show you a booklet and ask you some questions about it. Your opinions are very important to us. Take your time and tell me what your true opinions are.  If you don't have an opinion simply say so. It's OK to say I don't know.

[GIVE BOOKLET TO RESPONDENT]

**Please look at this booklet.  It contains several ads from recent issues of actual magazines. Take your time to read and review this information.**

*[Interviewer: give respondents sufficient time to look through the booklet. Then take the booklet back and put it aside away from the respondent]*

ii. Shopping scenario: Respondents were then told they were looking to buy wine at a store or a restaurant and encountered  two brands of wine. Specifically:

**You told me before that you bought or were considering buying wine at a store or a restaurant. I would like you to think about the following situation. You are at a store that sells wine or a restaurant that serves wine and are looking to buy a bottle of wine.**

**Please look at these two brands of wine.**

*[Interviewer: hand two photos to respondent]*

**Take your time to look at the two photos.**

**Are you ready? [***Respondent*** gives back photos*. Continue when respondent is ready]*

iii. Assessment: Examining Likelihood of Confusion Scenarios

After exposure to the magazine ads and being told about the setting, respondents were asked specific questions to assess each of the three types of Confusion scenarios discussed above.

21.   To measure Confusion Scenario I, the following questions were asked:

**Q1.** *[Give* CATENA  *photo to respondent to hold and ask about photo:]*

**a. Did this brand name appear in the ads you saw in the booklet, or did it not appear in the booklet?**
___**Yes it did**              ___**No it didn't**              ___**Don't know**

*[Take photo back. Give* CAVIA *photo to respondent to hold and ask:]*

**b. Did this brand name appear in the ads you saw in the booklet, or did it not appear in the booklet?**
___**Yes it did**              ___**No it didn't**              ___**Don't know**

If a Respondent said "yes" to either of these questions, the survey was then terminated. The difference between the percentage of Respondents who said "yes" to CAVIA versus CATENA provides the first component of the overall Net Confusion measure.

Respondents who said "no" or "don't know", continued with the interviewing process and were asked about the other two confusion scenarios.

22. To measure Confusion Scenario II, the following questions were asked:

**Q2. The next questions refer to the company who makes the wine you saw advertised in the booklet.**
*[Give* **CATENA** photo *to respondent to hold and ask:]*
**Do you think the company who makes the wine you saw advertised in the booklet, also makes this brand, or not?**

   ___**Yes it does** → For what reason or reasons did you say that this brand is made by same company you saw in the ad? *[probe for detailed explanations]*

 

 

   ___**No it doesn't**

   ___**DK**

*[Take photo back}*

*[Give* **CAVIA** photo *to respondent to hold and ask:]*
**Do you think the company who makes the wine you saw advertised in the booklet, also makes this brand, or not?**
   ___**Yes it does** → For what reason or reasons did you say that this brand is made by same company you saw in the ad? *[probe for detailed explanations]*

 

 

   ___**No it doesn't**

   ___**DK**

*[Take photo back]*

Please note that <u>only</u> respondents who explained that the reason for their affirmative answers had to do with the CAVIA or CATENA names were coded as confused. Respondents who described similarity in other dimensions including label design, colors, general look, type of wine as well as other unrelated reasons, were coded differently and

13

were not counted as confused. Thus, to be counted as confused in this phase, respondents had to answer "yes" to Q2 and provide a name-oriented explanation to the "why" question. This is a very conservative measure. As described in 21 above, the difference between the percentage of Respondents who said "yes" to CAVIA and gave a mark oriented explanation versus "yes" with a name-oriented explanation to CATENA, was calculated. This measure provides the second component of the overall Net Confusion measure.

23. To measure the third and last confusion scenario (approved, licensed or sponsored by Plaintiff), the following questions were asked:

*[Give CATENA photo to respondent to hold and ask:]*

**Q3.   Here are my last questions:**
**a.  Do you think the brand name shown in this photo,  was approved, licensed or sponsored by the company who makes the wine you saw advertised in the booklet, or not?**

**____Yes it was: →Why do you say**
**that?***[probe]*_____

_____

_____

**____No it wasn't**

**____DK**

*[Take photo back]*

*[Give CAVIA photo to respondent to hold and ask:]*

**b.  Finally, do you think the brand name shown in this photo,  was approved, licensed or sponsored by the company who makes the wine you saw advertised in the booklet, or not?**

**____Yes it was: →Why do you say that?***[probe]*_____

_____

_____

14

____**No it wasn't**

____**DK**


A coding scheme similar to the one used in Confusion Scenario II (see 22 above) was applied. Thus, to be counted as "confused" (in Scenario III) respondents had to answer "yes" to Q3 and provide a mark-oriented explanation to the "why" question. To ensure that no respondent is counted more than once as "confused", only respondents who were not classified as confused in the earlier questions were included in the calculations. In other words, respondents who were classified as confused in Q1 or Q2 were excluded from this analysis. As in 21 and 22 above, the difference between the number of those classified as confused for CAVIA and those who were classified as confused for CATENA, was calculated. This measure provides the third component of the overall Net Confusion measure. Finally, by adding up the individual Net Confusion components described above for each confusion scenario, we obtain the final Overall Net Confusion estimate.


24. To reduce potential presentation order bias, the order of presentation of the two wines was rotated.  In other words, half the respondents were first asked about CATENA and the other half were first asked about CAVIA. This design assures that the order of stimulus presentations does not affect the final conclusions. (See Surveys versions 1 & 2 in appendix B).


25. The Relevant Universe

Likelihood of confusion studies seek to address the relevant universe. Based on information provided and background analysis, the relevant universe can be defined as adult wine buyers who are in the market for a low to medium priced wine, in markets currently or potentially served by Defendant brand.

15

## 26. Target Population and Sampling

Given the definition of the universe as described in 25 above, the target population was operationalized as: buyers and potential buyers of wine sold at a store in the $5 to $20 (per bottle) price range and/or ordered at a restaurant in the $15 to $40 (per bottle) range. The target consisted of adults (over 21 years old), approximately 60% females and 40% males, in any of the 31 states where Defendant brand is distributed.

## 27. Data Collection: Mall Intercepts

Personal interviews are especially appropriate where it is necessary to show consumers specific stimuli. Mall intercept surveys are a common method for conducting such personal interviews. Given that adult wine buyers are found across all geographic regions, a random selection of all such customers is needed. To capture the diversity of the current and potential consumer base, six malls representing different parts of the country were selected. They cover a wide range of geographic and demographic factors. All locations serve customers that are likely to be in the market for the products studied here. The malls that were included were:

   i.   *California - Los Angeles area: Topanga Mall, 6600 Topanga Canyon Blvd Canoga Park, CA 91303*

   ii.  *Florida - Orlando area: Altamonte Mall, 451 E. Altamonte Dr. Altamonte Springs, FL 32710*

   iii. *Georgia - Atlanta area: Mall of Georgia, 3333 Buford Drive, Buford, GA 30519*

   iv.  *Illinois - Chicago area: Spring Hill Mall, 1298 Spring Hill Mall, West Dundee, IL 60118*

   v.   *Massachusetts - Boston Area: Arsenal Mall, 485 Arsenal Street, Watertown, MA 02472*

   vi.  *Texas - Dallas area: Vista ridge Mall, 2401 S. Stemmons Freeway, Lewisville, TX 75067*

## 28. Data Collection: Process & Procedures

Prospective respondents were randomly approached in the mall and were given an initial screening survey that included questions about age, gender (by observation), past and future purchase behavior and additional screening variables as described below (see Appendix B). Since the appropriate target for the study consisted of buyers and potential buyers of wine in a specific price range, the following key screening question was asked:

16

During the last 12 months, have you bought a bottle of wine in the 5 to 20 dollar price range at a store, or ordered a bottle of wine in the 15-40 dollar range at a restaurant?
1.  YES  →  GO TO **Q3**
2.  NO/DK →  In the next 12 months, will you consider buying a bottle of wine  in the 5 to 20 dollar range at a store or order a bottle of wine in the 15 to 40 dollar range at a  restaurant?
    a.  YES
    **b.**  NO/DK → THANK & **TERMINATE**

Only those who answered affirmatively were considered for the study. To disguise the purpose of the study, three additional purchase behavior and intention questions about a 7-day cruise, frozen pizza and IPHONE were included in the screener.

In addition to meeting the target market criteria, traditional market research screening criteria were also included. Specifically, prospective participants who are working now or have worked in the past for a marketing research firm or have participated in an interview in any shopping mall in the past 3 months were excluded. Additionally, to ensure that respondents were capable of evaluating the marks involved in this study, the screening phase inquired about the use and availability of reading glasses. Prospective respondents who use reading glasses but did not have the glasses with them were excluded from the final interview.

Once respondents qualified for the study, they were invited to go to the office of the market research firm (located in each mall). Final interviews were conducted inside the office. *Quick Test/Heakin Research*, a nationally recognized, well established, reputable market research firm was used for the data collection in all six malls. Interviews were conducted between 5/14/11 – 5/23/11 throughout the day and evening hours and during weekdays and weekends. The procedure employed is commonly used in most commercial marketing research projects conducted in the U.S. Respondents were paid a nominal $3 coop fee for participating in the study. The sample for this study includes 168 qualified respondents evenly divided between the six locations.

17

### 29.  Interviewing

All personal interviews were conducted at the offices of the market research firm mentioned above. As is customary in such research projects, all interviewing was double blind; that is, the respondents, interviewers, supervisors and managers of the market research firm were unaware of both the purpose and the sponsor of the research.  All interviewers were trained to ensure consistency and uniformity in implementing the survey. All interviewers signed a form indicating that they understood the study's procedures and protocols. See appendix C for a sample of the Interviewers Instruction forms.

### 30. Validation

Two different methods were employed to validate participation in this study. First as is customary in central location interviewing, validation of participation was done on site by the supervisors who approved the validity of the surveys. Respondents also provided their first name and phone number and signed a form indicating that they received the $3 coop fee.  Second, another reputable independent market research firm, M&R Data Collection, LLC, was contracted to call by phone every respondent and confirm their participation. M&R Data Collection LLC is a national research firm specializing in telephone data collection for consumer, political, policy, business-to-business, and other research projects. Of all individuals that were reached by phone by M&R Data Collection, LLC, 95% confirmed their participation.

### 31. Questionnaires

As indicated above, the study consisted first of a "screener" for identifying members of the previously defined universe and second a "Main Questionnaire." Representative copies are reproduced in appendix B.  As is customary in constructing questionnaires for survey research, close attention was paid to the design, sequence and wording of questions to ensure clarity, minimize bias and offer valid and reliable measures of the questions (issues) at hand. Order rotation was included (see appendix B).

32. <u>Stimuli</u>

The stimuli used in this study included four magazine ads: by ATT (best coverage worldwide), Celebrity Cruises (indulgence in luxury), Bel Gioioso (America's favorite fresh mozzarella) and CAVIT (see Appendix D).

<u>33. Data Analysis</u>

Completed survey responses were transmitted to Dr. Sarel.  The questionnaires were coded and the data entered into a computer file. Dr. Sarel conducted all data analysis and is responsible for the analysis and interpretations. The findings are presented next.

## FINDINGS

34. As indicated above, the sample size for this study was one hundred sixty eight qualified adult respondents collected nationwide in mall intercepts. These respondents passed the initial qualification criteria as described above and then participated in the actual study. The findings for all three Confusion Scenarios are reported below.

**Confusion Scenario I: <u>Defendant's product is believed to be Plaintiff's product</u>**

Analysis is based on q1:

**Q1.** *[Give* **CATENA** *photo to respondent to hold and ask about photo:]*

**a. Did this brand name appear in the ads you saw in the booklet, or did it not appear in the booklet?**
___Yes it did          ___No it didn't          ___Don't know

*[Take photo back. Give* **CAVIA** *photo to respondent to hold and ask:]*
**b. Did this brand name appear in the ads you saw in the booklet, or did it not appear in the booklet?**
___Yes it did          ___No it didn't          ___Don't know

<u>**Table 1**</u>
<u>**Is stimulus the one advertised in the booklet?**</u>

|  | <u>Yes</u> |
|---|---|
| **CAVIA** | $62^{2}$ |
| **CATENA** | 5 |
| **Net Confusion Scenario I** | 57 |

---

[2] Read: 62 out of 168 respondents said that the CAVIA brand was the one advertised in the booklet they saw earlier (which in reality was CAVIT).

35. **Confusion Scenario II: <u>Defendant's product is made by Plaintiff</u>**

Analysis is based on q2

**Q2. The next questions refer to the company who makes the wine you saw advertised in the booklet.**

*[Give* CATENA *photo to respondent to hold and ask:]*
**Do you think the company who makes the wine you saw advertised in the booklet, also makes this brand, or not?**

   **___Yes it does** → For what reason or reasons did you say that this brand is made by same company you saw in the ad? *[probe for detailed explanations]*

   _____

   _____

   **___No it doesn't**

   **___DK**

*[Take photo back}*

*[Give* CAVIA *photo to respondent to hold and ask:]*
**Do you think the company who makes the wine you saw advertised in the booklet, also makes this brand, or not?**
   **___Yes it does** → For what reason or reasons did you say that this brand is made by same company you saw in the ad? *[probe for detailed explanations]*

   _____

   _____

   **___No it doesn't**

   **___DK**

21

**Table 2**

**Is stimulus made by company who made the wine you saw advertised in booklet?**

|  | Yes |
|---|---|
| **CAVIA** | |
| Confused (name explanation[3]) | 8 |
| Unrelated explanation[4] | 8 |
| **CATENA** | |
| Confused (name explanation) | 1 |
| Unrelated explanation | 12 |

**Table 3**

**Net Confusion Scenario II (based on name explanations)**

| | |
|---|---|
| **CAVIA** | 8 |
| **CATENA** | <u>1</u> |
| **Net Confusion Scenario II:** | 7 |

36. **Confusion Scenario III: Defendant's mark was approved, licensed or sponsored by Plaintiff**

Analysis is based on q3. Only respondents who were not classified as confused (based on Q1 or Q2 for each brand) are included in the analysis.

---

[3] Only includes respondents who explained that the reason for their affirmative answers had to do with the name of the brand. These respondents are coded as confused.

[4] Includes all answers that are not clearly related to the name of the brand. These unrelated answers were not counted as indicating confusion.

*[Give* **CATENA** *photo to respondent to hold and ask:]*

**Q3.  Here are my last questions:**
**a.  Do you think the brand name shown in this photo,  was approved, licensed or sponsored by the company who makes the wine you saw advertised in the booklet, or not?**

**\_\_\_Yes it was: →Why do you say that?***[probe]*_____

_____

_____

**\_\_\_No it wasn't**

**\_\_\_DK**
*[Take photo back]*


*[Give* **CAVIA** *photo to respondent to hold and ask:]*

**b.   Finally, do you think the brand name shown in this photo,  was approved, licensed or sponsored by the company who makes the wine you saw advertised in the booklet, or not?**

**\_\_\_Yes it was: →Why do you say that?***[probe]*
_____

_____

_____

**\_\_\_No it wasn't**

**\_\_\_DK**

**Table 4**

**Was stimulus name approved, licensed or sponsored by the company who makes the wine you saw advertised in the booklet?**

**(analysis excludes those already classified for a specific stimulus as "confused")**

|  | Yes |
|---|---|
| **CAVIA** | |
| Confused (mark explanation) | **3** |
| Unrelated explanation | 11 |
| | |
| **CATENA** | |
| Confused (mark explanation) | **2** |
| Unrelated explanation | 11 |

**Table 5**

**Net Confusion Scenario III (based on name explanations)**

| | |
|---|---|
| **CAVIA** | 3 |
| **CATENA** | 2 |
| **Net Confusion Scenario III:** | 1 |

37. **Overall verified confusion measure between Defendant's mark and Plaintiff's mark**

<u>Table 6</u>

(n=168)

**<u>Number of Confused Respondents</u>**

| <u>Net Confusion</u> | <u>n</u> | <u>%</u> |
|---|---|---|
| **Confusion Scenario I** | 57 | 33.9 |
| **Confusion Scenario II** | 7 | 4.2 |
| **Confusion Scenario III** | <u>1</u> | <u>0.6</u> |
| | | |
| **Total number of confused respondents:** | 65 | 38.7% |

38. The study reported above found the net likely confusion to be estimated at 38.7% This finding is statistically highly significant.

25

## CONCLUSIONS

39. The study was designed to assess the likelihood of confusion between CAVIA and CAVIT. A conservative estimate calculated above found 38.7% of the relevant consumers to be confused. **This estimate is statistically highly significant and indicates that the likelihood of confusion is real and very substantial.**

40. The findings of this study support the conclusion that almost four out of ten qualified and relevant respondents were confused about the relationship between Defendant and Plaintiff's marks. It's important to note that the estimate is conservative and might very well underestimate the likelihood of confusion.

41. It should also be noted that in assessing Confusion scenarios II & III, the study employed a very conservative "name related explanation". In other words, only explanations that were clearly related to the names of the brands were coded as 'confused'. In reality, some of the other respondents could also have been confused but simply were not able to clearly articulate their reasoning.

42. I declare and state under penalty of perjury that to the best of my knowledge and understanding the entirety of this Expert Report is true and correct.

Date: 6/27/11

Dr. Dan Sarel

**Appendix A:**

**Dr. Sarel's CV**
**&**
**Representative List of Legal cases**

University of Miami                                        Last Revised
   School of Business                                   May 10, 2011

**Professor Dan Sarel**

Home Telephone: (305) 251-6005
Office Phone: (305) 284-1772
10100 SW 142nd Street
Miami, FL 33176

**Current Academic Rank:** Associate Professor
**Primary Department:** Marketing
**Secondary or Joint Appointments:** None
**Citizenship:** USA

## HIGER EDUCATION
### Institutional:

Doctor of Business Administration - Graduate School of Business
Administration
Harvard University, November, 1978

Post-Graduate Studies - Graduate School of Management
University of California at Los Angeles, 1975

Master of Business Administration - (with distinction-highest honors),
Hebrew University of Jerusalem, 1974

Bachelor of Arts - (with distinction-highest honors) in Economics
Hebrew University of Jerusalem, 1972

## EXPERIENCE
### Academic:

School of Business Administration, University of Miami
Associate Professor, 1983-present

School of Business Administration, University of Miami
Assistant Professor, 1981-1983

School of Business Administration, University of Connecticut
Assistant Professor, 1978-1981

School of Business Administration, Northeastern University
Instructor, 1978

Harvard Business School
Research and Case Development, 1977

Jerusalem Institute of Management
Research and Course Development, 1976

Graduate School of Management, University of California at
Los Angeles, Research Assistant, 1975

Graduate School of Business Administration, Hebrew University
Research and Teaching Assistant, 1972-1974

**Non-Academic:**

Marketing consulting and expert testimony, 1975-present

Market Scope, Inc 1985-1990
Director

Bank of Israel
Research Assistant, 1970-1971

Israeli Defense Army, 1966-1969

## PUBLICATIONS

**Juried or Refereed Journal Articles and Exhibitions:**
"The Effect of Consumer Surveys and Actual Confusion Evidence in Trademark
Litigation: An Empirical Assessment, *Trademark Reporter* (with H.
Marmorstein), 99, No. 6. , 1416-1436 (2009)

"Beyond Tax-Loss Harvesting: Maximizing Effective Returns by Accelerated
Recognition of Long-Term Gains" *Journal of Taxation of Investments,* (with H.
Marmorstein, J. Charnes & J. Johnson) Vol. 25, Number 1, Fall 2007, pp. 77-89

"Customer Relationship Management in Banking:  An Introduction and Strategic
Implications" *Journal of Financial Services Marketing* (with H. Marmorstein),
Fall 2007 Vol. 12, Number 2, November 2007 , pp. 97-101,  Editorial for special
issue on CRM in Banking.

"Addressing Consumers' Concerns about Online Security: A Conceptual and Empirical Analysis of Bank's Actions" *Journal of Financial Services Marketing,* (with H. Marmorstein)  Fall 2006, Vol. 11,  pp. 99–115 .

"Tax-loss Harvesting in Quarter 1?"  *Journal of Taxation of Investments,*  (with H. Marmorstein, J. Charnes & J. Johnson) Vol. 23, Number 2, January 2006 , pp. 152-165

"Childbirth Choice," *Marketing Health Services,* (formally *Journal of Healthcare Marketing*), Spring 2005, Vol. 25 Issue 1, p14-19 (lead article) (with H. Marmorstein, B. Rodriguez and P. Barach).

"Marketing Online Banking to the Indifferent Consumer: A Longitudinal Analysis of Banks' Actions," *Journal of Financial Services Marketing,* Vol. 8, Number 3, March 2004, 231-243 (with H. Marmorstein)

"Marketing Online Banking Services: The Voice of the Customer," *Journal of Financial Services Marketing,* Vol. 8, Number 2, December 2003, 106-118 (with H. Marmorstein)

"Unleashing the Power of Yield Management in the Internet Era," *California Management Review,* Vol. 45, Number 4, Spring 2003, (with H. Marmorstein and J. Rossomme).

"A Strategic Orientation for E-Commerce Investments: A customer Equity Approach", *Journal of Targeting, Measurement and Analysis for Marketing,* Vol. 11, Number 2, 2002, 110-123 (with H. Marmorstein).

"Designing Confusion Surveys for Cyberspace Trademark Litigation: The Admissibility vs. Weight Debate", *Intellectual Property & Technology Law Journal,* Volume 14, Number 9, September 2002, 12-17 (with H. Marmorstein).

"Migrating Customers to New Distribution Channels: The Role of Communication," *Journal of Financial Services Marketing,* Vol. 6, Number 3, March 2002 (with H. Marmorstein)

"Improving the Effectiveness of Banks' Service Guarantees: The Role of Implementation" *Journal of Financial Services Marketing,* Vol. 5, Number 3, March 2001 (with H. Marmorstein)

"The Role of Service Recovery in HMO Satisfaction", *Marketing Health Services* (formerly *Journal of Health Care Marketing*), Lead article, Spring 1999, PP 7-15 (with H. Marmorstein)

"Managing the Delayed Service Encounter: The Role of Employee Action and Customer Prior Experience" *Journal of Services Marketing,* Vol. 12, 3, 1998, 195-208 (with H. Marmorstein).

Also reprinted by *International Journal of Bank Marketing*, Vol 17, #6 pp 286-294

"Market Expansion Strategies", *Health Care Business Digest*, Vol. 3, No. 2 (February 1998) (with H. Marmorstein).

"Managing The Failed Service Encounter: How Employee Actions Affect Consumer Reponse to Delays," at the Sixth Annual AMA Frontiers in Services Conference, Nashville, TN October   1997 (witn H. Marmorsrein).

"Identifying New Patient Prospects: Efficacy of Usage Segmentation", *Journal of Health Care Marketing* (Winter 1996)(with H. Marmorstein).

"The Impact of Customer Satisfaction Based Incentive Systems on Salespeople's Customer Service Response: An Empirical Study", *Journal of Personal Selling and Sales Management,* Vol. XV No. 3 (Summer 1995)(with A. Sharma).

"Examining the Effectiveness of Service Guarantees: The Role of Process, Specificity, and Prior Experience", European Marketing Conference, Copenhagen May 1995 (with W. Lassar, H. Marmorstein).

"Expanding the Market for 'Unsought' Services: The Efficacy of Usage-Based Segmentation", at the AMA Frontiers in Services Conference, Nashville, TN October 1994 (witn H. Marmorsrein).

"An Analysis of Advertisements in the Journal of the American Academy of Dermatology 1980 & 1990", Journal of the American Academy of Dermatology, 1993(with D.J. Hogan et. al.).

"Linking Employee Compensation to Customer Satisfaction - an Exploratory study" at the AMA Frontiers in Services Conference, Nashville, TN October 1993 (witn A.Sharma).

"Customer and Non-Customer Perceptions of Third Party Services:  Are They Similar". The International Journal of Logistics Management, Vol. 3, No. 1, 1992, pp. 12-21.

"Service Quality and Customer  Satisfaction Monitoring Systems:  An exploratory Analysis". Presented at the AMA  Service Marketing Conference "Frontiers  in Services", Nashville, TN 1992.

"The Influence of Type of Advertisement, Price and  Source  Credibility on Perceived Quality", Journal of the Academy of Marketing  Science, Vol 20  No. 3, 1992 (with J. Gotlieb).

31

"Comparative Advertising Effectiveness: The Role of Involvement and Source Credibility" <u>Journal of Advertising,</u> Vol. 29 No. 1 (1991) pp. 38-45 (with J. Gotlieb).

"Perceived Quality and Consumer Satisfaction:"Effects of Price Advertisements on Perceived-Quality of Purchase Intentions", <u>Journal of Business Research,</u> Vol. 22 No.3 (May 1991) pp. 195-210 (with J. Gotlieb).

"Measuring Perceived Quality and Satisfaction:  The Experience of the Cruise Line Industry", <u>Travel and Tourism  in Transition:  The Research Challenge,</u> ESOMAR, Dublin  (May  1991) pp.  129-142.

"Cruise Industry in the USA: Matching Supply and Demand by 1990", <u>The Economist Travel and Tourism Analyst,</u> August, 1986, pp. 43-52 (with J. Lewis).

"Characteristic of Radio Commercials and their Recall Effectiveness", <u>Journal of Marketing</u> Vol. 50 (January 1986), pp. 52-60 (with M. Sewall).

This article is reprinted in Bellur, Berkman and Lee, <u>Readings In Advertising,</u> University Publisher and Printer, Hong Kong (1986).

"Decisions to Adopt New Medical Technologies:  A Case Study of Thrombolytic Therapy", <u>Social Science and Medicine,</u> Vol. 21, No. 3, pp. 291-298 (with D. Becker and L.B. Gardner).

"A Comparative Analysis of Models of Consumer Decision Under Risk", 1984 Southern Marketing Association.

"Trends in Factual Claims in Magazine Ads:  1958, 1968, 1978", <u>Journalism Quarterly,</u> Vol. 61, No. 3 (Autumn 1984) pp. 650-654, 743.

This article is reprinted in Bellur, Berkman and Lee, <u>Readings In Advertising,</u> University Publisher and Printer, Hong Kong (1986).

"A Comment on a Model and Methodology for the Development of Consumer Information Programs", <u>Journal of Marketing,</u> Volume 47, No. 3 (Summer, 1983), p. 103-107.

"Choosing Between Discrete Marketing Policy Alternatives Under Uncertain Market Response Conditions", <u>Journal of the Academy of Marketing Science,</u> Volume 12, No. 3 (Winter, 1984), (with J. Yassour).

"Consumer (Mis) Perceptions and Usage of Certification Marks, 1972 and 1980: Did Public Policy Have an Impact?", <u>Journal of Marketing</u> (Summer, 1981), (with M.V. Laric).

This article is reprinted in Bellur, Berkman and Lee, <u>Readings In Advertising University</u> Publisher and Printer, Hong Kong (1986).

"Using Cumulative Pretests Experiences to Improve the Effectiveness of Radio Commercials" (with M. Sewell) European Society for Opinion and Marketing Research, conference in Monte Carlo (Monaco) January 1983. Published in ESOMAR's <u>Seminar on Effective Advertising-Can Research Help?</u> pp. 149-162.

"Food Shopping Behavior in Stagflationary Times: The Experience in the U.S.A." 1983 meeting of the International Association for Research in Economic Psychology in Bologna, Italy.

"Models of Behavioral Choice Under Risk; A Review", <u>Proceedings of the 1982 Southern Marketing Association,</u> November, 1982.

"Advances in Environmental Psychology - A New Perspective on Consumer Behavior", K. Bernhardt et. al. (eds) <u>The Changing Marketing Environment: New Theories and Application,</u> American Marketing Association, 1981 (Annual Educators Conference) pp. 135-138.

"Consumer Evaluation Under Uncertainly: "Comparative Analysis of the Vector and Expected Utility Models". <u>American Institute for Sciences proceedings of Western Division Conference,</u> 1981.

"Preference Modeling of Managerial Marketing Decision Making", In: D.B. Montgomery and D.R. Wittink (eds.), <u>Marketing and Measurement Analysis</u> Marketing Science Institute Report No. 80-103, 1980, pp. 378-385 (Special ORSA/TIMS Conference on Market Measurement and Analysis), (With P. Cattin).

"An Exploratory Investigation of the Managerial Implications of `Generic' Brands", In: R.P. Bagozzi et al (ed.). <u>Marketing into the 80's - Changes and Challenges,</u> American Marketing Association, 1980, (Annual Educators Conference), (with M. Sewall).

"Product Positioning - A Reassessment", In: C.W. Lamb, Jr. and P.M. Dunne (eds.). <u>Theoretical Developments in Marketing,</u> American Marketing Association, l980, pp. 116-119 (Special Conference on Marketing Theory).

"Is Expected Utility a Descriptive Model of Consumer Decision Making Under Uncertainty?" In: H.S. Gitlow and E.W. Wheatley (eds.) <u>Developments in Marketing Science,</u> 1979, pp. 33- 37 (Annual Conference, Academy of Marketing Science).

"Meeting the Competitive Challenge:  A Search for New Strategies in Xerox", presented in the 1979 National Intercollegiate Case Clearing House (No. 9-580-672), (with M.V. Laric).

**Monographs Published:**

Consumer Evaluation Strategies", Working Paper, HBS 78-17, School of Business Administration, Harvard University (1978).
D.B.A. - An Investigation of the Effect of Risky Attributes on Consumer Evaluation Strategies.  Chairman, Professor David J. Reibstein (Boston, 1978)

M.B.A. - Consumer Store Loyalty - An Analysis in the Shoe and Furniture Industries.  Supervisor, Professor Arieh Goldman (Jerusalem, 1974)

**Book Reviews:**

Book review for Business Publications, Inc. Kent Publishing Company, Prentice Hall, and others.

**Other Works, Publications and Abstracts:**

"What do Purchasers Really Want - Understanding Needs of Decision-Making Processes", Annual Meeting of Seatrade, Miami, Florida 1988.

"The Yacht-like Cruise Market", Annual Meeting of Seatrade, Miami, Florida 1987.

"A Comparative Analysis of Models of Consumer Decision Under Risk", University of Connecticut Working Paper, 1981.

"Consumers Perception and Use of Composite Information Measures-Empirical Findings and Policy Implications", Annual meeting of the European Economic Psychologists, Leuven Brussles, 1980.

"Modeling Marketing Managers' Decisions", University of Connecticut Working Paper, 1979, (with P. Cattin).

"Comments on Perceived Risk and Composition Models for Multi-Attribute Decisions", University of Connecticut Working Paper, 1979.

"Meeting the Competitive Challenge:  A Search for New Strategies in Xerox", presented in the 1979 National Conference of A.I.D.S. and distributed as a case by the Intercollegiate Case Clearing House (#9-580-672), (with M.V. Laric).

"Witco Chemical LTD (Israel) - A case developed for the Jerusalem Institute of Management. (1977).

"Iscar LTD (Israel)" - A case developed for the Jerusalem Institute of Management (1977).

"Envirodata" - A case developed at the Harvard Business School and distributed by the Intercollegiate case Clearing House (1977).

## PROFESSIONAL

### Funded Research Performed:

Co-principal investigator in: "Study on Quality Indicators for Consumers' Use in Selecting Hospitals and Establishment of a Safety Authority".  Sponsoring Agency: Agency for Health Care Administration, State of Florida (grant size: $949,997.81), 2003-2004.

Marketing Science Institute: A grant for exploratory study on generic products (with Murphy A. Sewall), 1979.

University of Connecticut Research Foundation Award, 1979. "A Longitudinal Analysis of Communication Strategies in the Print Media".

"Characteristics Leading to Significant Differences in Recall Rates for Radio Commercials", sponsored by Radio Recall Research, Holmdel, New Jersey.

### Editorial Boards:

Journal of Financial Services Marketing

### Reviewer/Discussant:

Reviewed papers for the Journal of Advertising, Journal of the Academy of Marketing Science, Journal of Financial Services Marketing, American Marketing Association, American Academy of Advertising, Southern Marketing Science.

35

**Professional and Honorary Organizations:**

American Marketing Association, 1978 to present

Association of Consumer Research, 1979 to 1985

American Institute of Decision Sciences, 1978 to 1985

European Economic Psychologists, 1980 to 1990

Travel Research Association, 1977 to 1992

American Academy of Marketing Science, 1978 to present

**Honors and Awards:**

Outstanding Young Man of America - 1980

Hyman J. Shaber Fellowship - 1976/77

Graduate School of Business Administration, Harvard University Annual Fellowships - 1975/76, 1976/77, 1977/78

University of California at Los Angeles - International Students Exchange Fellowship - 1975

Graduate School of Business Administration, Hebrew University, Annual Fellowships - 1972/73, 1973/74

Faculty of Social Sciences, Hebrew University Annual Scholarships and Special Awards - 1970/71, 1971/72, 1972/73

**Other Professional Activities (e.g., papers presented; performances; conference proceedings, seminar or conference panel member, catalogue work, etc.):**

Multiple professional presentations and seminars

**TEACHING**

**Teaching Specialization (courses taught):**

Services Marketing, Marketing Management, eCommerce and Internet Marketing, Advertising & Promotion, Market research, Consumer Behavior, Healthcare Marketing.

**Thesis and Dissertation Advising:**

Multiple thesis and dissertation advising for students in SBA, school of communications and others

Executive MBA Graduate Thesis Advising, University of Miami, 1983 - 1990.

Graduate Thesis advising University of Connecticut, 1979 - 1981.

**SERVICE**

**University Committees and Administrative Responsibilities:**

University of Miami:
University Level
Graduate School Member
Accreditation Review Committee Member
Technical Support Committee Member
Survey Research Committee

School of Business Level
School Council Member 1982 - 1986, 1996 -present
Tenure Committees 2002 – present
Graduate Curriculum Review Task Force 2007- present
Gold Fund Member 1986 - 1995
Ph.D. Committee member 1986 - 1990
eCommerce concentration - leader
Faculty Advisory Committee 1990 - present
Master of Science in Quality Planning Committee 1991 - present
MBA Enhancement Committee 1991 - 1992
Department of Marketing Recruiting Committee Member
Advertising Major Committee Member

University of Connecticut Committee Work
Bowater Prize in Marketing - Chairperson
Marketing Internship - Chairperson
Undergraduate Curriculum and Courses - Member
Marketing Research Forum - Member

**Community Activities:**

SoFIE Awards – Judge

Presentations before multiple professional and civic organizations

Expert witness on marketing, communication and trademark issues

### Dr. Dan Sarel - Representative List of Legal Cases

**Case:** Living Essentials (5 Hour Energy) v. Bhelliom Enterprise Corp. (8 Hour energy), (2011)
**Law Firm (Plaintiff):** Brooks Kushman (Southfield, MI)
**Lead attorney:** Thomas W. Cunningham, Esq.,
**Work performed:** Expert analysis, Developed Likelihood of Confusion report

**Case:** Living Essentials (5 Hour Energy) v. N2G DISTRIBUTING, INC. (6 Hour Energy), (2010)
**Law Firm (Plaintiff):** Brooks Kushman (Southfield, MI)
**Lead attorney:** Marc Lorelli, Esq.,
**Work performed:** Expert analysis of defendant survey

**Case:** Living Essentials (5 Hour Energy) v. N2G Distributing, Inc. (2010)
**Law Firm (Plaintiff):** Brooks Kushman (Southfield, MI)
**Lead attorney:** Marc Lorelli, Esq.,
**Work performed:** Expert analysis and rebuttal report of defendant Likelihood of Confusion  survey

**Case:** Living Essentials (5 Hour Energy) v. N.V.E Pharmaceuticals (6 Hour Power) (2009-2010)
**Law Firm (Plaintiff):** Brooks Kushman (Southfield, MI)
**Lead attorney:** Marc Lorelli, Esq.,
**Work performed:** Conducted Likelihood of Confusion survey

**Case:** Living Essentials (5 Hour Energy) v. BDI Marketing (6 Hour energy), (2009)
**Law Firm (Plaintiff):** Brooks Kushman (Southfield, MI)
**Lead attorney:** Thomas W. Cunningham, Esq.,
**Work performed:** Conducted Likelihood of Confusion survey

**Case:** KMEDIA - VIVOPHONE v. VONAGE (2008)
**Law Firm (Plaintiff):** Brooks Kushman (Southfield, MI)
**Lead attorney:** Mark Cantor, Esq.,
**Work performed:** Conducted Likelihood of Confusion survey

**Case:** Pearl Artist & Craft Supply v. Spector and Sons (2007-2008)
**Law Firm (Plaintiff):** Kluger, Peretz, Kaplan & Berlin (Miami, FL)
**Lead attorney:** Steve I. Silverman, Esq.,
**Work performed:** Expert analysis of defendant survey

**Case:**  L.P.I. Consumer Products v. Eveready Battery Company (2007)
**Law Firm (Defendant):** Malloy & Malloy (Miami, FL)
**Lead attorney:** John C. Malloy III, Esq.,
**Work performed:**  Conducted studies to determine Likelihood of Confusion & Generic
v. Descriptive nature of the mark

**Case:** Assist 2 Sell v. First 2 Sell (2006)
**Law Firm (Plaintiff):** Genovese, Joblove & Battista (Miami, FL)
**Lead attorney:** Michael Joblove, Esq.,
**Work performed:** Expert analysis

**Case:** Home Depot v. Sunshine Ace Harware (2005)
**Law Firm (Defendant):** Niro, Scavone, Haller & Niro  (Chicago, IL)
**Lead attorney:** Paul K. Vickrey, Esq.,
**Work performed:**  Expert analysis of plaintiff's Likelihood of Confusion survey

**Case:** ABC Liquors v. ABC Discount Beverage (2004-2006)
**Law Firm (Plaintiff):** Kluger, Peretz, Kaplan & Berlin (Miami, FL)
**Lead Attorney:** Steven I. Peretz, Esq.
**Work performed:**  Conducted Likelihood of Confusion study

**Case:** Doral Golf Resort & Spa (KSL Hotel Corp.) v. Intercontinental Doral (2003)
**Law Firm (Plaintiff):** Boies, Schiller & Flexner (Miami, FL)
**Lead Attorney:** Lawrence Ashe, Esq.
**Work performed:** Conducted Likelihood of Confusion studies & Secondary Meaning
Study

**Case:** Panciera Memorial Home v. Scarano Service (2002)
**Law Firm (Plaintiff):** Wilson, Elser, Moskowitz, (Miami, FL)
**Lead Attorney:** Daniel Schwartz Esq.
**Work performed:** Expert testimony on strength of mark and advertising issues

**Case:** Ocean Drive Magazine v. Ocean Drive Fashion (2001)
**Law Firm (Plaintiff):** Richard Ross (Miami, FL)
**Lead Attorney:** Richard Ross. Esq.
**Work performed:** Expert analysis of defendant's Likelihood of Confusion survey

**Case:** Sun Microsystems v. Sun Coast Media (1998)
**Law Firm (Defendant):** Holland & Knight (Tampa & Orlando, FL)
**Lead Attorney:** David Barlow, Esq.
**Work performed:** Conducted Likelihood of Confusion studies

**Case:** Monkey Bar (NY) v. Monkey Bar & Grill (1998)
**Law Firm (Defendant):**  Richard Mariani (Palm Beach, FL)
**Lead Attorney:** Richard Mariani Esq.
**Work performed:** Conducted Likelihood of Confusion study

**Case:** Bongos Jeans v. Bongos Cuban Café (1997)
**Law Firm (Defendant):** Holland & Knight (Miami, FL)
**Lead Attorney:** Willfredo Rodríguez, Esq.
**Work performed:** Conducted Likelihood of Confusion study

**Case:** Kraft General Foods v. Lester Rosenblum (1995)
**Law Firm (Defendant):** Holland & Knight (Miami, FL)
**Lead Attorney:** Jon Stage, Esq.
**Work performed:** Expert opinion on trade dress and channel of distribution issues

**Appendix B: Questionnaires**

**Screen**

*Hi, I am_____ of _____ Research. We are a professional market research firm. We are conducting a short shopping survey today. It will only take a few minutes.*

Before we begin, I need some information about you so that we can be sure to get a representative sample.
[record] 1. MALE    2. FEMALE

**X1**. Which age group do you best fit into: (read answers)
1.  Under 21 → **TERMINATE**                    3. Over 35 → Continue
2.  21- 35  → CONTINUE                           4. REFUSED → **TERMINATE**

**X2**. Have you participated in an interview in any shopping mall in the past 3 months?
    1. YES →  THANK & **TERMINATE**
    2. NO  → CONTINUE

**X3.** I'm going to ask you about several products that you might have bought in the last 12 months or are considering buying in the next 12 months:

Q1. During the last 12 months, have you taken a 7-day cruise?
    1.   YES     → GO TO **Q2**
    2.   NO/DK  → In the next 12 months will you consider taking a 7-day cruise?
                        a.   YES
                        b.   NO/DK

**Q2**. During the last 12 months, have you bought a bottle of wine in the 5 to 20 dollar price range at a store, or ordered a bottle of wine in the 15-40 dollar range at a restaurant?
    3.   YES     →    GO TO **Q3**
    4.   NO/DK →    In the next 12 months, will you consider buying a bottle of wine  in the 5 to 20 dollar range at a store or order a bottle of wine in the 15 to 40 dollar range at a  restaurant?
                        c.   YES
                        **d.**   NO/DK  → THANK & **TERMINATE**

Q3. During the last 12 months, have you bought frozen pizza in the 5 to15 dollar price range at a supermarket?
    1.   YES
    2.   NO/DK →    In the next 12 months, will you consider buying frozen pizza in the 5 to 15 dollar price range at a supermarket?
                        a.   YES in the 7 to 15 dollars price range
                        b.   NO/DK

Q4. During the last 12 months, have you purchased an IPHONE?
    1.   YES
    3.   NO/DK →    In the next 12 months, will you consider buying an IPHONE?
                        a.   YES
                        b.   NO/DK

**X3.**  Are you employed now or have you ever been employed by a market research firm?
                1. YES → THANK & TERMINATE
                2. NO →CONTINUE

**X4.**  Do you normally wear glasses or contact lenses to read?
                1 NO, DON'T WEAR- CONTINUE
                2 YES, ASK: Do you have those glasses with you or your contacts in?
                        1 YES  → CONTINUE
                        2 NO → Thank & **TERMINATE**


**QUALIFIED REPONDENTS CONTINUE:**


**That's great.  You qualified for the short study. We really need your input. Please come with me to the office to answer a few short questions. The survey will take only a few minutes.**

**Inside Facility Survey:   V1**
*[Interviewer: Read these sentences slowly& clearly. Glasses could be used if needed]*

During the interview I'm going to show you a booklet and ask you some questions about it. Your opinions are very important to us. Take your time and tell me what your true opinions are.  If you don't have an opinion simply say so. It's OK to say I don't know.

[GIVE BOOKLET TO RESPONDENT]

**Please look at this booklet.  It contains several ads from recent issues of actual magazines. Take your time to read and review this information.**

*[Interviewer: give respondents sufficient time to look through the booklet. Then take the booklet back and put it aside away from the respondent]*

**You told me before that you bought or were considering buying wine at a store or a restaurant. I would like you to think about the following situation. You are at a store that sells wine or a restaurant that serves wine and are looking to buy a bottle of wine.**

**Please look at these two brands of wine.**

*[Interviewer: hand two photos to respondent]*

**Take your time to look at the two photos.**

**Are you ready?** [*Respondent **gives back photos**. Continue when respondent is ready]*

**I'm going to ask you a few questions about the two brands and the ads you just saw in booklet.**

**Q1.** *[Give* CATENA *photo to respondent to hold and ask about photo:]*

**a. Did this brand name appear in the ads you saw in the booklet, or did it not appear in the booklet?**
___Yes it did          ___No it didn't          ___Don't know

*[Take photo back. Give* CAVIA *photo to respondent to hold and ask:]*
**b. Did this brand name appear in the ads you saw in the booklet, or did it not appear in the booklet?**
___Yes it did          ___No it didn't          ____Don't know

➔ ***If YES on ANY of the photos TERMINATE***

*If NOT or Don't know on BOTH photos, TAKE BACK photo and continue:*

44

**Q2. The next questions refer to the company who makes the wine you saw advertised in the booklet.**
*[Give* CATENA *photo to respondent to hold and ask:]*
**Do you think the company who makes the wine you saw advertised in the booklet, also makes this brand, or not?**

____**Yes it does** → For what reason or reasons did you say that this brand is made by same company you saw in the ad? *[probe for detailed explanations]*

_____

_____

____**No it doesn't**

____**DK**

*[Take photo back}*

*[Give* CAVIA *photo to respondent to hold and ask:]*
**Do you think the company who makes the wine you saw advertised in the booklet, also makes this brand, or not?**
____**Yes it does** → For what reason or reasons did you say that this brand is made by same company you saw in the ad? *[probe for detailed explanations]*

_____

_____

____**No it doesn't**

____**DK**

*[Take photo back]*
*[Give* CATENA *photo to respondent to hold and ask:]*

**Q3.  Here are my last questions:**
**a.  Do you think the brand name shown in this photo,  was approved, licensed or sponsored by the company who makes the wine you saw advertised in the booklet, or not?**

____**Yes it was:** →**Why do you say that?***[probe]*_____

_____

____**No it wasn't**

____**DK**

45

_[Take photo back]_

_[Give_ **CAVIA** _photo to respondent to hold and ask:]_

**b.   Finally, do you think the brand name shown in this photo,  was approved, licensed or sponsored by the company who makes the wine you saw advertised in the booklet, or not?**

\_\_\_**Yes it was: →Why do you say that?**_[probe]_
_____

  _____

  _____

\_\_\_**No it wasn't**

\_\_\_**DK**

Name & Interviewer Information

May I have your first name and phone number since my supervisor may want to verify that I conducted this interview?  First Name: _____          Cell Phone: ( \_ \_ \_ ) \_ \_ \_ - \_ \_ \_ \_

Interview Information:    Date: _____          Ending time:_____
Interviewer Name: _____          Interviewer verification:  I have followed all instructions given to me. This document is an accurate recording of the personal interview I conducted at the date and time stated above.

      Signature:_____

46

**Inside Facility Survey:   V2**
*[Interviewer: Read these sentences slowly& clearly. Glasses could be used if needed]*

During the interview I'm going to show you a booklet and ask you some questions about it. Your opinions are very important to us. Take your time and tell me what your true opinions are.  If you don't have an opinion simply say so. It's OK to say I don't know.

[GIVE BOOKLET TO RESPONDENT]

**Please look at this booklet.  It contains several ads from recent issues of actual magazines. Take your time to read and review this information.**

*[Interviewer: give respondents sufficient time to look through the booklet. Then take the booklet back and put it aside away from the respondent]*

**You told me before that you bought or were considering buying wine at a store or a restaurant. I would like you to think about the following situation. You are at a store that sells wine or a restaurant that serves wine and are looking to buy a bottle of wine.**

**Please look at these two brands of wine.**

*[Interviewer: hand two photos to respondent]*

**Take your time to look at the two photos.**

**Are you ready?** [*Respondent gives back photos. Continue when respondent is ready*]

**I'm going to ask you a few questions about the two brands and the ads you just saw in booklet.**

**Q1.** *[Give* CAVIA *photo to respondent to hold and ask about photo:]*

**a. Did this brand name appear in the ads you saw in the booklet, or did it not appear in the booklet?**
___Yes it did                    ___No it didn't                    ___Don't know

*[Take photo back. Give* CATENA *photo to respondent to hold and ask:]*
**b. Did this brand name appear in the ads you saw in the booklet, or did it not appear in the booklet?**
__Yes it did                    ___No it didn't                    ____Don't know

➔  *If YES on ANY of the photos TERMINATE*

*If NOT or Don't know on BOTH photos, TAKE BACK photo and continue:*

**Q2. The next questions refer to the company who makes the wine you saw advertised in the booklet.**

*[Give* CAVIA *photo to respondent to hold and ask:]*

**Do you think the company who makes the wine you saw advertised in the booklet, also makes this brand, or not?**

   **___Yes it does** → For what reason or reasons did you say that this brand is made by same company you saw in the ad? *[probe for detailed explanations]*

_____

_____


**___No it doesn't**

**___DK**


*[Take photo back}*

*[Give* CATENA *photo to respondent to hold and ask:]*

**Do you think the company who makes the wine you saw advertised in the booklet, also makes this brand, or not?**

   **___Yes it does** → For what reason or reasons did you say that this brand is made by same company you saw in the ad? *[probe for detailed explanations]*

_____

_____


**___No it doesn't**

**___DK**


*[Take photo back]*

*[Give* CAVIA *photo to respondent to hold and ask:]*

**Q3.  Here are my last questions:**

**a.  Do you think the brand name shown in this photo,  was approved, licensed or sponsored by the company who makes the wine you saw advertised in the booklet, or not?**

**___Yes it was:** →**Why do you say that?***[probe]*_____

_____

_____

**___No it wasn't**

**___DK**

*[Take photo back]*

*[Give* **CATENA** *photo to respondent to hold and ask:]*

**b.   Finally, do you think the brand name shown in this photo,  was approved, licensed or sponsored by the company who makes the wine you saw advertised in the booklet, or not?**

**\_\_\_Yes it was: →Why do you say that?***[probe]*

_____

_____  \_\_\_\_

_____

**\_\_\_No it wasn't**

**\_\_\_DK**

### Name & Interviewer Information

May I have your first name and phone number since my supervisor may want to verify that I conducted this interview?  First Name: _____        Cell Phone: ( \_ \_ \_ ) \_ \_ \_ - \_ \_ \_ \_

Interview Information:    Date: _____        Ending time:_____
Interviewer Name: _____    Interviewer verification:  I have followed all instructions given to me. This document is an accurate recording of the personal interview I conducted at the date and time stated above.

Signature:_____ \_\_\_

49

**Appendix C:**
**Interviewers Research Instructions**

**Interviewers Research Instructions**

Quota: 28

       Males= 11     Females= 17
       Versions V1=14,   V2=14

Respondents are to be selected based on screener. Specifically:
- Over 21, spread across all ages
- 11 males, 17 females
- Meeting all screening criteria on questionnaire
- Randomly approached during weekdays & weekends

Procedures
1. Prospective respondent is approached and screened for qualifications (SCREEN).
2. If qualified, invite to go into research office
3. Keep record of non-qualified respondents
4. Affix screener to questionnaire
5. Make sure respondent sits comfortably. Start the actual interview. Follow instruction on survey as written, DON'T IMPROVISE.
6. Give respondent booklet. Let respondents take as much time as they wish to review ads in the booklet. When done REMOVE booklet.
7. MAKE SURE BOOKLETS ARE NOW HIDDEN. THIS IS CRITICAL. RESPONDENTS ARE NOT ALLOWED TO GO BACK TO BOOKLET
8. Read questions exactly as written. Do not deviate or use your own wording.
9. When instructed give photos to respondents. Let them hold photos. Take back photos when instructed..
10. Note that if a "YES" answer was given to ANY product in Q1 – you need to terminate the interview.
11. Probe as instructed in Q2 & Q3. Write down exact answers.
12. Sign survey form. Respondents will be contacted to check that all procedures were followed.


If there any questions ask your supervisor.


**Interviewer Acknowledgement**

I have read these instructions and understand them fully. I will follow all procedures as instructed.

Interviewer Name:_____    Signature:_____

Supervisor's signature:_____    Date:_____

**Appendix D: STIMULI**

**MAGAZINE ADS**









**BelGioioso®**
**FRESH MOZZARELLA**
*"America's Favorite"*

Classic Margherita Pizza with BelGioioso Fresh Mozzarella

#1 selling brand based on sales data gathered by SymphonyIRI in over 17,000 supermarkets

Made only a few hours after milking, BelGioioso Fresh Mozzarella complements a variety of foods with its unique texture and delicate flavor. Traditionally, this cheese is served with sliced fresh tomatoes, basil and olive oil. But don't stop there. It also enhances salads and light meals. Melt it onto pizzas or add it to any sandwich for a creamy wonderful flavor. The possibilities are virtually endless.

Discover the mouth-watering goodness of Fresh Mozzarella. Discover BelGioioso.

CLASSIC ITALIAN CHEESE · MADE IN THE U.S.A.
FORMAGGI CLASSICI ITALIANI · FATTI IN AMERICA

**BelGioioso**
*Recipes and more at belgioioso.com*

WISCONSIN CHEESE®
*Made Daily from Fresh Local Milk.*

rBST Free*
*No significant difference has been found in milk from cows treated with artificial hormones.*

*Find BelGioioso's family of cheeses in the deli section of your local market.*

57

**WINES**





## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Expert Report of Dr. Dan Sarel, titled "CAVIT v. CAVIA Likelihood of Confusion Study", dated May 27, 2011, has been served on all parties of record on this 27th day of May, 2011 via E-mail and U.S. Mail, First-Class, postage prepaid, to:

Jennie S. Malloy, Esq.
Meredith Frank Mendez, Esq.
David Andrew Gast, Esq.
Oliver Alan Ruiz, Esq.
Malloy & Malloy, P.A.
2800 S.W. Third Avenue
Miami, FL 33129

Russell D. Dize (*pro hac vice*)