UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 10-CV-23464-KING

PALM BAY INTERNATIONAL, INC.

    Plaintiff,

vs.

CORK ALLIANCE, INC., d/b/a SOUTHERN
VINES, INC. and HORACIO O. PEIRO,

    Defendants.
_____/

**DEFENDANTS' MOTION TO EXCLUDE AS EVIDENCE THE SURVEY AND EXPERT REPORT OF DR. DAN SAREL AND PRECLUDE HIS TESTIMONY AT TRIAL AND INCORPORATED MEMORANDUM OF LAW**

    Defendants, Cork Alliance, Inc. and Horacio O. Peiro (collectively "Defendants") submit this motion and memorandum of law in support, seeking to preclude the testimony of Dr. Dan Sarel ("Sarel"), exclude his expert report, and the evidence of the survey he conducted in connection with this litigation ("the Sarel Survey").

**I.**  **INTRODUCTION.**

    This Court should preclude Sarel's testimony and exclude his expert report because it fails to "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed R. Ev. 702. Instead, Sarel conducted an unreliable and improper survey that would be of no utility to the Court in this matter because: (a) it used an improper and inappropriate universe/sampling; (b) the survey methodology (which is the same methodology used by Sarel for the last three (3) years for other plaintiffs and has always yielded a finding of likelihood of confusion) is improper; (c) the implementation of the survey is flawed and suggestive; (d) the survey does not provide for adequate number of controls; and (e) the single control used was improper. As such, the admission of Sarel's testimony, survey and expert report would mislead and prejudice the Court and result in an improper finding of law that would constitute reversible error. Accordingly, the Sarel Survey and expert report should be excluded because they are erroneous and essentially of no value as evidence of likelihood of confusion. Similarly, Sarel's testimony at trial should be precluded because it is based on his erroneous expert report and survey.

**II.     STATEMENT OF FACTS.**

Plaintiff, Palm Bay International, Inc. ("Plaintiff") brought an action, *inter alia*, under 15 U.S.C. §1125(a), alleging a likelihood of confusion between the CAVIT mark and the Defendants' CAVIA mark.  In support of its trademark infringement and unfair competition claims, Plaintiff, through counsel, commissioned Sarel to conduct a survey on the likelihood of confusion between the CAVIT and CAVIA brand wines as well as prepare an expert report, entitled "CAVIT v. CAVIA Likelihood of Confusion Study" ("the Sarel Report," **Exhibit A** hereto) based on the Sarel Survey.

### The Sarel Survey

Sarel conducted a mall intercept survey at six (6) malls throughout the country based on interviews with 168 adult buyers and potential buyers of wine sold at a store in the $5 to $20 (per bottle) price range, and/or ordered at a restaurant in the $15 to $40 (per bottle) range.  The respondents were asked to look through a booklet containing recent magazine advertisements for two (2) famous brands**,** AT&T and CELEBRITY CRUISES; an advertisement for CAVIT brand wine; and an advertisement for a relatively unknown and unpronounceable brand, BEL GIOIOSO PIZZA, for a total of four (4) advertisements.  **Sarel Report, p. 11 and Appendix D.** Respondents were not told to concentrate on the advertisements or to even pay attention to the names in the advertisements.

After looking at the four (4) advertisements, the respondents were told they were looking to buy wine at a store or restaurant and were shown photographs of two (2) brands of wine, CAVIA and CATENA. **Sarel Report, p. 12 and Appendix D.** Then, the interviewer took the two (2) photographs back from the respondent.

### Confusion Scenario I

Next, the interviewer showed the respondent a photograph of CATENA wine and asked: "Did this brand name appear in the ads you saw in the booklet, or did it not appear in the booklet?" The respondent was instructed to check in a booklet one of the following answers: __Yes it did.  __ No it didn't __ Don't know. Then, the interviewer showed the respondent a photograph of CAVIA wine and asked the respondent: "Did this brand name appear in the ads you saw in the booklet, or did it not appear in the booklet?" The respondent was instructed to check in a booklet one of the following answers:  __ Yes it did.  __ No it didn't __Don't know. **Sarel Report, p. 12.**

2

If a respondent answered "yes" to either question, the survey was terminated. **Sarel Report, p. 12.** However, the interviewer did <u>not</u> ask the respondent: "For what reason or reasons did you say yes" or any other follow-up questions. If a respondent answered "no" or "don't know" to either question, the survey continued and respondents were asked about two other scenarios explained below. **Sarel Report, p. 13.**

<u>Confusion Scenario II</u>

The interviewer told the respondent: "the next questions refer to the company who makes the wine you saw advertised in the booklet." The interviewer then showed the respondent the photograph of CATENA wine and asked: "Do you think the company who makes the wine you saw advertised in the booklet, also makes this brand, or not?" The term "brand" was not defined or explained by the interviewer. The interviewer then took back the photograph. If the respondent answered "yes", the interviewer asked the follow-up question: "For what reason or reasons did you say that this brand is made by the same company you saw in the ad?" Moreover, the interviewer would probe the respondent for more details or explanations for his or her answer. **Sarel Report, p. 13.** The interviewer then showed the respondent the photograph of CAVIA wine and repeated the same process. **Sarel Report, p. 13.**

<u>Confusion Scenario III</u>

Next, the interviewer showed the respondent the photograph of CATENA wine and told the respondent: "Here are my last questions: Do you think the brand name shown in this photo was approved, licensed or sponsored by the company who makes the wine you saw advertised in the booklet, or not?" The term "brand" was not defined or explained by the interviewer. The interviewer then took back the photograph. If the respondent answered "yes", the interviewer probed the respondent for more details or explanations for his or her answer. **Sarel Report, p. 14.** The interviewer then showed the respondent the photograph of CAVIA wine and repeated the same process. **Sarel Report, p. 14.**

<u>The Rappeport Rebuttal to the Sarel Report</u>

Defendants commissioned Dr. Michael Rappeport, Ph.D., of RL Associates ("Rappeport") to evaluate the Sarel Survey and to provide Defendants' expert witness report and testimony as well as perform a separate study of the likelihood of confusion between the CAVIT and CAVIA brand wines which resulted in a finding of <u>no</u> legally meaningful likelihood of confusion. Dr. Rappeport prepared a rebuttal report entitled "Commentary on Sarel Study" (the

3

"Rappeport Rebuttal," **Exhibit B** hereto). Dr. Rappeport is one of the country's leading survey experts, has significant experience in the field of survey evidence (see **Exhibit C** hereto), and is cited by one of the leading treatises on trademark law, McCarthy on Trademarks and Unfair Competition.[1] The Rappeport Rebuttal examines: (1) the overall approach to the design of the Sarel Survey; (2) the general implementation of the design; and (3) the details such as the specific wording of questions or the specific screens used in selecting the sample.

## III.     ARGUMENT.

As discussed in detail herein, Sarel conducted an unreliable and improper survey that would be of no utility to the Court in this matter, primarily because: (a) it used an improper and inappropriate universe/sampling; (b) the survey methodology (which is the same methodology used by Sarel for the last three (3) years for other plaintiffs and has always yielded a finding of likelihood of confusion) is improper; (c) the implementation of the survey is flawed and suggestive; (d) the survey does not provide for adequate amount of controls; and (e) the single control used was improper. Accordingly, the Sarel Survey and Sarel Report are of essentially no value as evidence of likelihood of confusion between the CAVIT and CAVIA brand wines, and should, therefore, be excluded. Furthermore, given the nature of the claims the survey seeks to speak to, the opinions offered by Sarel by virtue of his survey, report, and testimony would not only be useless to the Court but might potentially misinform, confuse the issues, and prejudice the Court and more likely than not result in reversible error. As such, the Sarel Survey, Sarel Report and all evidence relating to the same should be excluded from trial. Similarly, Sarel's testimony at trial should be precluded on the same grounds.

### A.     Legal Standards Governing Admission of Expert Testimony

Rule 702 of the Federal Rules and Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to facts of the case.

---

[1] See 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition (hereafter "McCarthy") §32:164, FN 7 (2008); Id. at § 32:187, FN 5.

4

Fed.R.Evid.702. This rule has been amended in response to <u>Daubert v. Merrel Dow Pharms. Inc.</u>, 509 U.S. 579 (1993), and to the many cases applying <u>Daubert</u>, including <u>Kumho Tire Co. Ltd. v. Carmichael</u>, 526 U.S.137 (1999) and <u>General Elec. Co. v. Joiner</u>, 522 U.S.136, 140 (1997).

In <u>Daubert</u>, the Supreme Court directed district courts to perform a screening or "gatekeeping" function to ensure that evidence presented by expert witnesses is relevant, reliable, and helpful to the jury's evaluation of such evidence. <u>Daubert</u>, 509 U.S. at 589, 597. In <u>Kumho Tire</u>, the Supreme Court reiterated this role and clarified that the gatekeeper function applies to all expert testimony, not just scientific testimony. <u>Kumho Tire</u>, 526 U.S. at 151.

To satisfy the demands made by Rule 702 and <u>Daubert</u> / <u>Kumho Tire</u>, the trial court must *first* determine that the expert opinion is <u>reliable</u> and "more than subjective belief or unsupported speculation." <u>Daubert</u>, 509 U.S at 590. The focus must be "solely on the principles and methodology, not on the conclusion that they generate." <u>Santoro v. Donnelly</u> 340 F.Supp. 2d 464, 472 (S.D.N.Y. 2004) (*quoting* <u>Daubert</u>, 509 U.S. at 597). Under <u>Daubert</u> the trial court must *also* determine whether the expert testimony offered is <u>relevant</u> in that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702.

Furthermore, pursuant to Rule 403, the Court may also exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Fed.R.Evid.403. Finally, the proponent of an expert's testimony bears of establishing its admissibility by a preponderance of the evidence. See <u>Figueroa v. Boston Sci. Corp.</u>, 254 F. Supp. 2d 361, 366 (S.D.N.Y. 2003).

Reliability of expert testimony can be determined by four criteria established in <u>Daubert</u> including: (1) whether the theory or technique can be, or has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) general acceptance within the relevant scientific community. (<u>See</u> 509 U.S. at 593-94). The trial court must exclude expert testimony "if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith." <u>Boucher v. U.S. Suzuki Motor Corp.</u>, 73 F.3d 18, 21 (2d Cir. 1996). Further, a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. <u>Joiner</u> 522 U.S. at 146.

With particular regard to survey evidence, in appropriate cases, the trial court may

completely exclude a survey report from being received into evidence. See McCarthy § 32:158 (Citing National Football League Properties, Inc. v. Prostyle, Inc., 57 F. Supp. 2d 665, 668-670 (E.D. Wisc. 1998) (a survey report was excluded from evidence because, among other reasons, the survey failed to include a control)). Indeed, an improperly conducted survey with serious methodological defects may be excluded as irrelevant. See McCarthy § 32:170 (Citing Starter Corp. v. Converse, Inc., 170 F.3d 286, 50 U.S.P.Q.2d 1012 (2d Cir. 1999) (it was proper for the district court to exclude a survey from evidence because the survey questions were irrelevant: [A]ny probative value of the survey was outweighed by its potential to confuse the issues in the case.")

      **B.**    **Inappropriate/Inadequate Universe**

The Sarel Survey, and evidence and opinions related to the survey, should be excluded because the survey does not adequately include "a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services". Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 264 (5th Cir.1980). Specifically, the survey universe was overbroad because 15 respondents (almost 10%) had not purchased wine within the last twelve (12) months leading up to the survey. Furthermore, the universe included anyone over the age of 21. As such, the survey universe consisted of anyone who was over the age of 21 at the time of the survey, who was "considering" purchasing wine in the next twelve (12) months, regardless of whether they had ever purchased wine before. In fact, with respect to the 15 respondents that fell into this category, there is **no evidence that they had ever purchased wine at all**.

In assessing the reliability and relevance of survey evidence, the Court must determine whether the "universe" was properly defined. Atlanta Allergy & Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta, LLC, 685 F. Supp. 2d 1360, 1373 (N.D. Ga. 2010); citing Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City, 383 F.3d 110, 118-19 (3rd Cir. 2004) (citing 2 McCarthy § 32:159). The universe is that segment of the population whose perceptions and state of mind are relevant to the issues in the case. Id. "Even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant." McCarthy § 32:159; see Citizens Fin. Group, 383 F.3d at 119.

Given these standards, the survey is fatally flawed because it included consumers who had not purchased wine in the time leading up to the survey. Instead, the survey included a significant segment of consumers who may have never purchased wine before, but who were

6

instead "considering" purchasing wine in the future (i.e., the next 12 months). The failure to restrict the universe to consumers that had actually purchased wine in the weeks and/or months leading up to the survey, renders it unreliable. Consumers who were "considering" purchasing wine within the next twelve (12) months do not constitute "a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services". Amstar, 615 F.2d at 264. For these reasons, and the other reasons that follow in this memorandum, the Sarel Survey should be excluded, along with any other evidence or opinions related to the survey.

    C.    **Flawed Methodology of the Sarel Survey**

As discussed above, the Sarel Survey aims to address the likelihood of confusion between the CAVIT and CAVIA brand wines. The overall approach taken in the Sarel Survey is referred to as a "(criminal) lineup" type survey.

> A lineup type survey is in general terms analogous to a criminal lineup. In a standard criminal lineup, a respondent who was "exposed to the perpetrator during the course of a crime" is then presented with a number of "possible" perpetrators, and asked to pick which, if any, of these individuals they thought they had seen commit the crime." In the Sarel survey design, the analogous experience to an observer's exposure in the "course of the crime" was a one page print advertisement for CAVIT that the respondent was shown as one of four such advertisements. The "possible perpetrators" included in the lineup were two brands of wine (CAVIA and CATENA).

**Rappeport Rebuttal, p.1.** Indeed, Sarel testified[2] that in the last three (3) years, he has used this same methodology for other plaintiffs and this methodology has <u>always</u> yielded legally sufficient likelihood of confusion for plaintiffs.

    1.    <u>There is No Evidence that CAVIT is Well-Known or Known to Respondents</u>

There is <u>no</u> evidence and <u>no</u> reason to believe that CAVIT is well-known or even known by the survey respondents. **Rappeport Rebuttal, p.2.** The respondents were never asked if they had purchased CAVIT wine in the past and were never asked if they ever heard of CAVIT before seeing the advertisement in the survey booklet.

One of two ways in which the survey conditions may provide an analogous situation to the level of attention ordinarily paid by observers of a crime is that the initial brand name shown (i.e. CAVIT), be already reasonably well-known to respondents. In that case, even a fleeting

---

[2] Defendants took the deposition of Sarel on June 28, 2011 and Plaintiff took the deposition of Rappeport on June 29, 2011. Therefore, the transcripts of the depositions were unavailable prior to the preparation and filing of this motion. Accordingly, Defendants request leave to supplement this Motion once they receive the deposition transcripts of Sarel and Rappeport.

7

exposure of the respondent to the brand name will result in significant ability to recall the name as shown.  **Rappeport Rebuttal, p.2.**

The Sarel Survey, which attempts to resemble a criminal line-up, does not replicate the close attention paid by the observer of a crime, which underlies the effectiveness of a criminal line-up.  **Rappeport Rebuttal, p.2.**  Moreover, the survey respondents were not instructed to pay attention to or concentrate on the names. Indeed, Sarel testified that he does not know if the respondents just glanced at the advertisements.

        2.        Small Exposure to a Single Advertisement is Not How Consumers Purchase Wine in the Marketplace

Another reason the Sarel Survey should be excluded is that it does not demonstrate how consumers would purchase wine in the real world. It is unreasonable to believe that consumers purchase wine based on exposure to a single advertisement. **Rappeport Rebuttal, p.3.**  In the real world, a consumer is faced with several choices of wine, many times side-by-side on a market shelf. In addition, the purchase of wine can be considered a reasonably significant purchase. **Rappeport Rebuttal, p.2.**  The methodology used by Sarel, namely, the use of a single advertisement, was found to be flawed in the district court decision in Smith v. Wal-Mart Stores, Inc., 537 F. Supp. 2d 1302, 1328 (N.D. Ga. 2008), which noted that "[a]ctual purchasers . . . would not hastily read an advertisement, nor would a potential purchaser read it carelessly." (Citing to Gen. Motors Corp. v. Cadillac Marine & Boat Co., 226 F. Supp. 716, 737 (D.C. Mich. 104)).  Although the case cited in Smith involved the purchase of a boat (which the court noted did not implicate "the same level of financial consideration"), it nonetheless found that decision instructive in the context of a survey directed to the purchase of t-shirts, the goods at issue in the trademark infringement case before it. Surely, equal or more care is exercised by consumers who purchase wine, as compared to those that purchase t-shirts.

The Sarel Survey assumes that the only way consumers know about wines is from an advertisement. However, Sarel acknowledges in his report that: "A consumer who had a positive experience with a specific brand mentioned or heard the name mentioned or recommended is more likely to gravitate toward that brand." **Sarel Report, p. 8.**  Sarel testified that exposure to a single advertisement is not the most common situation why a consumer would purchase a particular brand of wine.  Sarel further acknowledged that the advertisements in the survey were used for identification purposes and cannot replicate a consumer having had a prior experience

8

with a wine such as a recommendation from a friend or having previously tasted the wine. Moreover, Sarel testified that the marketing conditions surrounding the decision by consumers to purchase wine also include wine tastings, word of mouth recommendations, displays, sitcoms, movies, representations at stores, and social media.

Accordingly, since there is no evidence that CAVIT is well-known or previously known to the respondents, and because the purchase of wine is a reasonably significant purchase which consumers do not simply purchase on the basis of seeing a single advertisement, the Sarel Survey design cannot produce evidence about the likelihood of confusion between the CAVIT and CAVIA brand wines in the real world. Instead, the Sarel Survey design, which Sarel has admitted was a memory test, provides no more than a test of a respondent's attention to detail and memory ability when shown a not particularly well known name embedded as but one of many details in four advertisements. **Rappeport Rebuttal, p.3.**

        D.      <u>**Flawed Implementation/Suggestiveness of the Sarel Survey**</u>

Even if the methodology used by Sarel was proper, the implementation of the survey is flawed rendering the survey useless. First, as discussed above, the interviewers told respondents in advance that they will be asked about only two names (CAVIA, and the one control CATENA[3]). Second, the actual wording of the critical questions presented a serious problem in interpretation and analysis as there is a tendency of many people to look for a "right" answer. Therefore, many respondents will be led to think that the task is really to decide which of the two names (CAVIA and CATENA) comes closer to the not quite clearly remembered name (CAVIT) they saw as one detail in four advertisements. **Rappeport Rebuttal, p.3-4.** Of course, between the two names, the closer name is CAVIA, which is a likely explanation for the percentage of confusion yielded by the survey. Indeed, Sarel could have asked a follow-up question to determine why the respondents answered "yes" (as he did with the question in Scenarios II and III) to the question: "Did this brand name appear in the ads you saw in the booklet, or did it not appear in the booklet?" This follow-up question would have likely resulted in the fact that some respondents were guessing or that it was the closer of the two names. Thus, not only was the implementation improperly suggestive, but also the survey amounted to a memory test, which is unreliable for purposes of this case, as discussed below. In other words, this segment of the

---

[3] The choice of CATENA as the single control and as an improper control name is discussed in section E below.

9

survey has no indication as to the reason <u>why</u> the respondents answered "yes."

As noted in McCarthy on Trademarks, the leading trademark treatise, [a] survey which does little more than test respondents' memory of a controlled exposure to a trademark stimulus has been held to prove something, but not very much." § 32.171; <u>citing</u> <u>Franklin Resources, Inc. v. Franklin Credit Management Corp.</u>, 45 USPQ2d 1872, 1884 (S.D.N.Y. 1997); <u>see also</u> <u>Starter Corp. v. Converse, Inc.</u>, 170 F.3d 286 (2nd Cir. 1999) (it was proper for district court to exclude survey from evidence before the jury because the survey questions were irrelevant. Survey question was characterized as "little more than a memory test" which was not probative of the likelihood of confusion issue). Similar to the Sarel Survey, the respondents in the <u>Franklin</u> case were shown a booklet containing advertisements of four companies, including the plaintiff's mark, in Phase One of the survey. Then, in Phase Two of the <u>Franklin</u> case survey, the respondents were shown advertising promotions of three companies, including the defendant, and were asked:

> "Was there a product or service in the booklet I showed you [in Phase One] that is from the same source or company as [shown in this Exhibit in Phase Two]?"

McCarthy on Trademarks § 32.171. Ultimately, the Franklin court decided that the survey had "slight probative value," but noted that [s]urveys which do nothing more than demonstrate the respondents' ability to read are not probative on the issue of likelihood of confusion." 45 USPQ2d at 1883.

Here, the Sarel Survey, which he admitted was a "memory test," is of no probative value on the issue of likelihood of confusion, and should be excluded, particularly since the respondents who answered "yes" were not asked any follow-up questions to determine why they answered "yes". At a minimum, any slight probative value is outweighed by the danger of prejudice or confusion of issues.

      E.    <u>**Improper and Inadequate Number of Controls**</u>

The use of CATENA as the single control is improper. A well designed survey must incorporate some means to disentangle real world behavior from the survey artificial behavior. In the great majority of cases, this is accomplished through the use of controls to filter out the "noise." Controls are used to eliminate the amount of guesses made by respondents in a survey because respondents believe there is a "right" answer. Whereas in the marketplace, guessing by consumers does not occur.

Using a "control" is critical to gaining an accurate understanding of "net confusion," which is the difference between the raw confusion percent and the control confusion percent (or "background noise").  See McCarthy § 32:187 (Citing J. Jacoby, Experimental Design and Selection of Controls in Trademark and Deceptive Advertising Surveys, 92 Trademark Rptr 890, 905 (2002)).  See also McCarthy § 32:187 (Citing Reed-Union Corp. v. Turtle Wax, 77 F.3d 909, 37 U.S.P.Q.2d 1718 (7th Cir. 1996) (an apparent 25% confusion rate from one survey was marginalized when a control survey revealed a noise of 20%; thus a finding of non-infringement was affirmed).  By way of analogy, McCarthy cites Rappeport, the Defendants' expert witness in this case, in noting that the use of a control "serves much the same purpose in surveying as use of a placebo does in drug testing."  McCarthy § 32:187 (Citing M. Rappeport, Litigation Surveys: Social Science as Evidence, 92 Trademark Rptr 957, 986 (2002)).

As discussed above, respondents in the Sarel Survey were led to believe that they were required to choose between two names, CAVIA or CATENA. Therefore, the choice of the control becomes critical. **Rappeport Rebuttal, p.4.**  A poorly chosen control will lead to lower estimate of the "noise" and thus a higher estimate of the likelihood of confusion 'net of noise'. **Rappeport Rebuttal, p.4.**  Especially for a survey done on behalf of a plaintiff, one criterion for a control is to come as close as possible to the claimed infringing name (here, CAVIA) without itself being seen as an infringement. **Rappeport Rebuttal, p.4.**  Clearly, CATENA does not come as close to CAVIA as the wide range of other names that Sarel could have chosen.  Indeed, Plaintiff has acknowledged that wines merely starting with the prefix CAV do not infringe the CAVIT mark. In a recently settled lawsuit alleging trademark infringement, Cavit Cantina Viticoltori Consorzio Cantine Sociali Del Trentino Societa Cooperativa, the purported owner of the CAVIT mark and former plaintiff in this action who was recently dismissed with prejudice, agreed to the continued use and trademark registration of CAVUS for wine.

Therefore, Sarel could have – and should have – chosen a control from the numerous wines in the marketplace starting with the prefix CAV, such as CAVUS. The choice of CATENA as a control can only be justified if Plaintiff would in fact claim infringement for any wine name starting with the letters CAV (which is clearly not the case).  Otherwise Dr. Sarel should have used at least one control starting with CAV. **Rappeport Rebuttal, p.4.**

Moreover, in addition to the fact that the control used by Sarel was improper, just as a criminal line-up does not merely consist of the suspect and one other person, the Sarel Survey

11

should have included at least 3 or 4 controls. **Rappeport Rebuttal, p.3, FN 1.**

V.   **CONCLUSION.**

For the foregoing reasons, the Sarel Survey, Sarel Report and testimony are of no evidentiary value in this case, and should therefore be excluded/precluded under Daubert and its progeny.  Furthermore, the Sarel Survey, Sarel Report and deposition transcript should also be excluded under Rule 403 because its probative value is substantially outweighed by the danger of unfair prejudice, and/or confusion of the issues. Similarly, Sarel's testimony at trial should be precluded for the same reasons.

WHEREFORE, Defendants respectfully request that this Court exclude the Sarel Survey, Sarel Report and Sarel's deposition testimony, preclude Sarel's testimony at trial, grant Defendants leave to supplement this Motion with deposition citations once they receive the deposition transcripts of Sarel and Rappeport, and such further relief the Court deems just and proper.

Dated: July 2, 2011                                     Respectfully submitted,

                                                          s/Meredith Frank Mendez
                                                          Jennie S. Malloy
                                                          Florida Bar No. 655,740
                                                          jsmalloy@malloylaw.com
                                                          Meredith Frank Mendez
                                                          Florida Bar No. 502,235
                                                          mmendez@malloylaw.com
                                                          Oliver A. Ruiz
                                                          Florida Bar No. 524,786
                                                          oruiz@malloylaw.com
                                                          MALLOY & MALLOY, P.A.
                                                          2800 S.W. Third Avenue
                                                          Miami, Florida  33129
                                                          Telephone (305) 858-8000
                                                          Facsimile (305) 858-0008
                                                          *Attorneys for Defendants*

## CERTIFICATE OF GOOD FAITH CONFERENCE

I hereby certify that counsel for the movant has made reasonable efforts to confer with all parties and non-parties who made be affected by the relief sought in this motion but has been unable to do so. The reasonable efforts made were leaving a voicemail for Plaintiff's counsel (approximately an hour after having a telephonic good faith conference regarding several motions in limine filed by Plaintiff later that evening) and sending two follow-up emails.

By:   s/Meredith Frank Mendez
      Meredith Frank Mendez

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by via transmission of Notices of Electronic Filing generated by CM/ECF on July 2, 2011 on all counsel or parties of record on the Service List below.

By:   s/Meredith Frank Mendez
      Meredith Frank Mendez

## SERVICE LIST

Robert C. Josefsberg
rjosefsberg@podhurst.com
Katherine W. Ezell
KEzell@podhurst.com
PODHURST ORSECK, P.A.
25 W. Flagler Street, Suite 800
Miami, Florida 33130
Telephone: (305) 358-2800
Facsimile: (305) 358-2382
Attorneys for Plaintiff

and

Charles W. Grimes
grimes@gandb.com
Russell D. Dize
dize@gandb.com
GRIMES & BATTERSBY, LLP
488 Main Avenue
Suite 300
Norwalk, CT 06851
Telephone: (203) 849-8300
Facsimile: (203) 849-9300
Attorneys for Plaintiff