UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-23464 CIV-KING/McALILEY

PALM BAY INTERNATIONAL, INC.,

    Plaintiff,

vs.

CORK ALLIANCE, INC. doing business
as Southern Vines, Inc. and HORACIO O.
PEIRO,

    Defendants.
_____/

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE AS EVIDENCE THE SURVEY AND EXPERT REPORT OF DR. DAN SAREL AND PRECLUDE HIS TESTIMONY AT TRIAL**

Plaintiff, Palm Bay International, Inc. ("Palm Bay"), respectfully submits this memorandum of law in opposition to Defendants' Motion to Exclude as Evidence the Survey and Expert Report of Dr. Dan Sarel and Preclude His Testimony at Trial ("Motion").

I.    **INTRODUCTION**

Defendants' Motion repeatedly reiterates conclusory statements about Dr. Sarel and his survey, trying to make it seem as if justifiable grounds exist for granting the motion, to wit: "unreliable and improper survey;" "improper and inappropriate universe/sampling;" "survey methodology … is improper;" "implementation of the survey is flawed and suggestive;" "survey does not provide for adequate number of controls;" and "single control used was improper." (Defendants' Motion at 1, 3).

However, all such statements are disingenuous because they are directly refuted by the testimony of Defendants' own survey expert, Dr. Michael Rappeport:

1. Dr. Rappeport not only vouches for the propriety of the survey methodology used by Dr. Sarel – Dr. Rappeport goes so far as to state: "I use such methods all the time, so does everybody[1];"

2. Dr. Rappeport also indicates that the manner in which Dr. Sarel implemented the survey methodology was correct if either:

   a. Plaintiff's CAVIT brand is "well known" – like "GALLO[2];" or

   b. the purchase of a bottle of CAVIT or CAVIA wine at a $5-$10 price point is not a reasonably significant purchase to a consumer (e.g., like the purchase of toothpaste or vitamins);[3]

3. Finally, Dr. Rappeport admits that, unlike Dr. Sarel:

   a. he did not even test for "mistaken identity" likelihood of confusion;[4] and that

   b. the evidence of confusion he found would be **in addition to** the level of confusion found by Dr. Sarel – indeed Dr. Rappeport went so far as to say: "But in fact if [the Judge] credited, totally credited both surveys, had no problems, *[Plaintiffs] would have a fairly strong argument that there is real confusion, in my opinion*" (emphasis added).[5]

Indeed, upon closer examination, it becomes readily apparent that Defendants' Motion fails on a number of grounds, including that:

---

[1] Declaration of Russell D. Dize, dated July 18, 2011 ("Dize Decl.") Exh. A at 14, lines 7-8.
[2] Dize Decl., Exh. A at 247, lines 14 et seq.
[3] Dize Decl., Exh. A at 244, lines 8 et seq.
[4] Dize Decl., Exh. A at 99, lines 18 – 24.
[5] Dize Decl., Exh. A at 100, line 18 –101, line 6.

  A. it inexplicably advances legal positions that have been refuted:

    1. by the testimony of Defendants' own expert, Dr. Michael Rappeport; and

    2. by prior legal precedent; and

  B. it is based, not upon facts, but rather, upon nothing more than:

    1. unsubstantiated arguments of Defendants' counsel; and

    2. speculation of Defendants' expert;

neither of which forms the proper factual basis for questioning, let alone excluding, Dr. Sarel's testimony, report or survey; and

  C. it ignores well-settled case law in this Circuit and elsewhere holding that alleged technical deficiencies affect a survey's weight, not its admissibility.

## II. ARGUMENT

### A. THE LEGAL STANDARD REGARDING ADMISSION OF TRADEMARK SURVEY EVIDENCE

While there is no doubt that a trial court, in the exercise of its "gatekeeping" function, may, in the appropriate case, exclude a survey report from being received into evidence, ordinarily survey evidence is found sufficiently reliable and admissible under the test in *Daubert*. *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n.8 (9th Cir. 1997) ("as long as they are conducted according to accepted principles . . . survey evidence should ordinarily be found sufficiently reliable under *Daubert*. Unlike novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value").

"The majority rule is that while technical deficiencies can reduce a survey's weight, they will not prevent the survey from being admitted into evidence. This is especially true in a non-jury case." 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:170 at 32-354 (4th ed. 2010); *See also Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d

833, 844 (11th Cir. 1983) ("alleged technical deficiencies affect the survey's weight, however, and not its admissibility"; survey was properly admitted); *Holiday Inns, Inc. v. Holiday Out In America*, 481 F.2d 445, 447 (5th Cir. 1973) ("the district court properly admitted survey evidence in this case, leaving the format of the questions and the manner of conducting the survey for consideration as to the weight of this evidence"); *C.A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049, 1055 n.10 (5th Cir. July 6, 1981) ("if the inadequacies in the survey had been technical, such as the format of the questions or the manner in which it was the survey [sic] was taken, those shortcomings would have borne on the weight of the evidence, not its admissibility").

Other Circuits are in accord. *See Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 523 (10th Cir. 1987) (technical and methodological deficiencies "relate not [to] the survey's admissibility but to the weight to be given such evidence"); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir. 1992) ("[I]t is routine to admit a relevant survey; any technical unreliability goes to weight, not admissibility"); *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993) ("[A]ny shortcomings in the survey results go to the proper weight of the survey and should be evaluated by the trier of fact"; rarely will a survey be so flawed as to warrant exclusion); *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987) (criticisms of statistical deficiencies in a survey affect only the weight to be accorded the survey evidence, not its admissibility).

One of the main roles of the trial court's gatekeeping function under *Daubert* is to prevent unreliable survey evidence from **reaching the jury**. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) ("The trial judge's effort to assure that the specialized testimony is reliable and relevant can help the jury evaluate that foreign experience, whether the

testimony reflects scientific, technical, or other specialized knowledge"). The instant action, however, will be resolved by the Court, as there is no longer a jury demand.[6] Accordingly, there will be no possible prejudice to a jury, and the Court will be more than amply able to determine the probative value of Plaintiff's survey. *See Hutchinson v. Essence Communications, Inc.*, 769 F. Supp. 541, 557 (S.D.N.Y. 1991) (in a non-jury case it is appropriate to admit the survey data into evidence but determine how much weight to accord it); *See also* K.A. Plevan, *Daubert's Impact on Survey Experts in Lanham Act Litigation*, 95 Trademark Rptr. 596 (2005) (Of 44 cases examined over an eight year period (1997-2004), in all 14 cases in which surveys were excluded from evidence or accorded no weight at all, a jury trial had been demanded).

"[T]he Ninth Circuit has observed that once a survey has passed the threshold criteria of having a proper foundation, being relevant and having been conducted according to accepted principles, it can be admitted into evidence." 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:170 at 32-354 (4th ed. 2010), *citing Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001).

As the following explanation makes clear, the Sarel survey is relevant and has been conducted according to accepted principles. Accordingly, it should not be excluded.

### B. THE SAREL REPORT AND SURVEY SHOULD NOT BE EXCLUDED

#### 1. Dr. Rappeport Vouches for Dr. Sarel's Survey Method

The type of survey conducted by Dr. Sarel in this case, namely, a "two room survey" in which respondents are shown initial stimuli in "Room 1" and the testing stimuli and a control in "Room 2", and then asked questions about such stimuli, has been widely used and approved. In fact, Dr. Rappeport, Defendants' survey expert, acknowledged during his deposition that he had

---

[6] Plaintiff's jury demand was dropped by virtue of the Court's Order dated June 27, 2011 (D.E. # 71), and Defendants did not demand a jury trial.

no issue with the type of survey conducted by Dr. Sarel, but instead had issues with how it was implemented. When asked if he had ever used a similar survey method, Dr. Rappeport stated:

> "[I]t's not the overall method, it's not can you use a method in which you show something in one room and then have people look at something in a second room. I use such methods all the time, so does everybody. . ." (Dize Decl., Exh. A. at 14); and

> "I am not criticizing Dr. Sarel because he used a two-room methodology, in and of itself; it was the way it was done. It was the implementation." (Dize Decl., Exh. A at 85).

In addition, Dr. Rappeport made clear that his problems with the Sarel survey involved mainly technical or statistical issues, as opposed to overall methodology:

> "I made computations and he made computations. I think his computations were done incorrectly." (Dize Decl., Exh. A at 12).

Dr. Rappeport also admitted that there is a certain amount of judgment and art that goes into survey design:

> "You make a judgment, you do the best you can. I mean it's flattering, you keep acting like this is science. . .These are not formulas. There is judgment involved. I am not arguing that there is no judgment involved." (Dize Decl., Exh. A at 203).

In fact, Dr. Rappeport made clear in his deposition that in his view the deficiencies in the Sarel survey were not sufficient to render it unreliable, but rather, there was a valid argument about the calculation of confusion and about the questions that were asked the survey respondents. Dr. Rappeport stated:

> "[I]f you want to argue about whether we did the right thing in the survey or we did the right thing or Dr. Sarel did the right thing, I am perfectly prepared to argue. That's what this type of argument is. ***It's not an argument about it's unreliable or anything. . .***" (Dize Decl., Exh. A at 50) (emphasis added).

Therefore, it is clear that Defendants' own survey expert believes that the alleged deficiencies in Dr. Sarel's survey do not rise to a level where his survey and report should be excluded.

Dr. Rappeport's approach, namely that the Sarel survey should be allowed into evidence but the Court should determine the appropriate weight to accord such survey, is exactly the approach that the courts have consistently used when ruling on the exclusion of trademark surveys. Exclusion is rare, and indeed, most courts choose to admit the survey and then decide the appropriate weight it is to be given. *See* Section II(A), *supra*.

Dr. Rappeport even testifies that the manner in which Dr. Sarel implemented the survey methodology was correct if either: (a) Plaintiff's CAVIT brand is "well known"; or (2) the purchase of a bottle of CAVIT or CAVIA wine at a $5-$10 price point is not a reasonably significant purchase to a consumer (e.g., like the purchase of toothpaste or vitamins). (Dize Decl., Exh. A at 244, lines 8 *et seq.*).

### a) The CAVIT Brand Is "Well Known"

Plaintiff submits that there is ample evidence in the record that the CAVIT mark is well known. The CAVIT Trademarks have been exclusively used by Palm Bay in the United States, and Palm Bay's large sales and extensive advertising and promotion of wines bearing the CAVIT Trademarks have made the mark famous. (Declaration of Michael Petteruti, dated June 28, 2011, D.E. # 75-3 ("Petteruti S.J. Decl.) ¶ 17; Declaration of Russell D. Dize, dated July 1, 2011, D.E. # 75-8 *et seq.* ("Dize S.J. Decl.")[7] Exh. D at 60-61). CAVIT brand wines were first imported and sold in the United States at least as early as 1979, and have been continuously and widely sold in the U.S. since that time. (Petteruti S.J. Decl. ¶ 4). According to figures provided by AC Nielsen, CAVIT ranks as the #1 selling Italian wine, the #1 selling Pinot Grigio and the #1 selling imported Pinot Noir in the United States. (Petteruti S.J. Decl. ¶ 7; Dize S.J. Decl., Exh. A at 62). Annual sales of CAVIT wine exceed 3 million cases. (Petteruti S.J. Decl. ¶ 8;

---

[7] The Dize Declaration submitted with Plaintiff's Motion for Summary Judgment is referenced herein as "Dize S.J. Decl.", while the Dize Declaration submitted in connection with the instant motion is referenced herein as "Dize Decl.".

7

Dize S.J. Decl., Exh. B at 8-9). Since 1979, the CAVIT Trademarks have been displayed in the United States on the labels of wine, signage, displays, boxes, containers, packaging, point of purchase displays, tags, promotional clothing and other promotional items. (Petteruti S.J. Decl. ¶ 14). Palm Bay has spent upwards of $100 million to market, advertise and promote the CAVIT brand in the United States since 1979, and Palm Bay spends millions of dollars to market, advertise and promote the CAVIT brand in the United States on an annual basis. (Petteruti S.J. Decl. ¶ 10).

Significantly, in the face of the overwhelming evidence in the record that the CAVIT mark is well known, Defendants do not offer even a scintilla of evidence in rebuttal. Defendants instead ask the Court to exclude Dr. Sarel's survey and report and preclude his testimony on the basis of nothing more than attorney conclusions and the baseless speculation of their expert. It is not a coincidence that no legal precedent justifying any such action is cited by Defendants. Plaintiff respectfully submits that none exists.

### b)   A $5-$10 Wine Purchase Is An Impulse Purchase

Plaintiff also submits that witnesses in this case have testified that the purchase of a $5-$10 bottle of wine is often an impulse purchase. (Dize Decl., Exh. B at 101-102; Exh. C at 130, 168; Exh. E at 22). Indeed, Dr. Rappeport acknowledged as much during his deposition:

Q.   "Is the purchase of wine ever an impulse purchase?"

A.   "Of course." (Dize Decl., Exh. A at 17-18).

Dr. Rappeport's testimony, as well as the $5-$10 price range in which CAVIT and CAVIT wines are sold, belies Dr. Rappeport's contention that the purchase of wine is a reasonably significant purchase to a consumer.

### c) Dr. Rappeport Admits That Dr. Sarel's Methodology Was Proper

In view of the foregoing, Plaintiff submits that it is undisputed that the CAVIT brand is well-known, and that the purchase of a $5-$10 bottle of wine is not a reasonably significant purchase to a consumer. Accordingly, by Dr. Rappeport's own admission, the implementation of the Sarel survey was proper.

### 2. Dr. Sarel's Survey Method Closely Replicates Marketplace Conditions

It is rather ironic that Defendants have the audacity to question Dr. Sarel's survey, given that Defendants' own survey expert, Dr. Michael Rappeport, **has been widely criticized for conducting the exact same type of survey that he conducted for Defendants in this case**, namely, a survey using index cards to display the trademarks at issue instead of the actual products on which the trademarks appear.

Several courts have held that it is irrelevant to ask questions about the conflicting marks as they appear on printed index cards, divorced from packaging and house marks. *See National Distillers Prods. Co. v. Refreshment Brands, Inc.*, 198 F.Supp.2d 474, 484 (S.D.N.Y. 2002) (Showing respondents the mark printed on a card rather than on a bottle as it would appear in the marketplace was one of the "methodological errors that prevented [the survey] from replicating actual market conditions"); *See also Playtex Products, Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 168 (2d Cir. 2004) (because the use of index cards containing trademarks placed out of context did not replicate the marks as "presented and packaged" in the marketplace, the survey results were not relevant); *Juicy ZCouture, Inc. v. L'Oreal USA, Inc.*, 2006 WL 1012939 at *25 (S.D.N.Y. Apr. 19, 2006) (survey in which respondents were shown 8 ½ by 11 inch index cards bearing only the accused word marks offered no value on the issue of actual confusion; court

found that the use of index cards was a "fundamental flaw" in the survey design because it did not "replicate the market conditions" in which the accused marks were encountered).

It is telling that Dr. Rappeport, throughout his deposition, and indeed in his expert report, consistently stated that it was important for a survey to replicate marketplace conditions:

> Q. "Mr. Rappeport, you indicated in your survey report on page three of the methodology intro that it is important to, quote, "Replicate actual market conditions." Specifically you said that "There is a desire to replicate actual marketplace conditions. . .So that's an accurate statement obviously because it's your statement, correct?"
>
> A. "I hope so. . . what I mean by market conditions is how people would behave in the market. . ." (Dize Decl., Exh. A at 141).

Later in his deposition, Dr. Rappeport stated: "Because its real world you are trying to replicate. . ." (Dize Decl., Exh. A at 171).

Notwithstanding these statements, Dr. Rappeport admits that the trademarks as they appeared on the index cards used in his survey (all in block letters in the same font) did not replicate the way in which those brands appear in the marketplace, and that in the marketplace consumers would encounter the labels of the products along with any attendant designs. (Dize Decl., Exh. A at 83, 95, 141-142, 221).

In contrast, Dr. Sarel's survey utilizes advertisements and photographs depicting the parties' exact products as consumers would encounter them in the marketplace. As such, it is Dr. Sarel's survey, not Dr. Rappeport's survey, which more closely resembles marketplace conditions. Given this fact, the Sarel survey will be more helpful to the Court than the Rappeport survey in assessing the likelihood of confusion between the CAVIT and CAVIA trademarks, and therefore it should not be excluded.

### 3. Prior Legal Precedent Favorably Comments Upon the Use of Dr. Sarel's Methodology (and Harshly Maligns Dr. Rappeport and His Methodology)

Defendants' expert has been criticized in the past - at times harshly - by Courts of Appeals and District Courts for, *inter alia*, his employment of faulty methodologies and for his presentation of unreliable results.[8] *See Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship.*, 34 F.3d 410, 415 (7th Cir. 1994);[9] *See also National Distillers Products Co. v. Refreshment Brands, Inc.*, 198 F.Supp.2d 474, 484 (S.D.N.Y. 2002) (the court expressly criticized Rappeport's use of his "index card" methodology rather than showing the marks on the labels of bottles); *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 799 (6th Cir. 2004) (Reliance on Rappeport's flawed survey was misguided); *Urban Outfitters, Inc., et al. v. BCBG Max Azria Group, Inc.*, 511 F.Supp.2d 482, 499-500 (E.D.Pa. 2007) (the court found Rappeport's testimony to be unpersuasive and that his survey should be given limited weight); and *First Nat'l Bank in Sioux Falls v. First Nat'l Bank So. Dakota, SPC, Inc.*, 655 F.Supp.2d 979, 999-1000 (D.S.D. 2009) (the court both: (i) criticized the "index card" methodology Rappeport used and praised the "advertising methodology" the other expert used – the same methodology that Plaintiff's expert used here; and (ii) criticized the "control" that Rappeport had selected because it would "increase survey noise and artificially diminish the level of confusion" – exactly as Rappeport attempted to do here).

---

[8] Indeed, it is difficult to understand how Defendants can hold out Dr. Rappeport as a leading expert in the face of such harsh criticism. Moreover, while Defendants criticize Dr. Sarel, counsel for Defendants have utilized Dr. Sarel's services as an expert in the past.

[9] The 7th Circuit Court of Appeals in the *Indianapolis Colts* case stated: "Both parties presented studies. The defendants' was prepared by Michael Rappeport and is summarized in a perfunctory affidavit by Dr. Rappeport to which the district judge gave little weight. That was a kindness. . . Rappeport has been criticized before for his methodology (*Jarret Int'l. Inc. v. Promotion in Motion, Inc.*, 826 F.Supp 69, 73-74 (E.D.N.Y. 1993)), and we hope that he will take these criticisms to heart in his next courtroom appearance." More than a decade later, the 6th Circuit Court of Appeals, when confronted with another survey by Rappeport, felt compelled to repeat verbatim the 7th Circuit Court of Appeals' criticism. *See AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 799 (6th Cir. 2004).

Other cases have also criticized Rappeport's "index card" method when used by other experts. *See Playtex Products, Inc. v. Georgia-Pacific Corporation*, 390 F.3d 158, 167-68 (2d Cir. 2004); and *Juicy ZCouture, Inc. v. L'Oreal USA, Inc.*, 2006 WL 1012939 at *24-25 (S.D.N.Y. 2006). They have also criticized the "side-by-side" method employed by Rappeport. *See Reddy Communications, Inc. v. Environmental Action Foundation*, 477 F.Supp. 936, 947 (D.D.C. 1979); *Walt Disney Productions v. Air Pirates*, 581 F.2d 751, 759 (9th Cir. 1978) (comparison of the mark and the imitation "should not be a simple, visual, side-by-side comparison but rather the mark and the imitation should be viewed in light of what occurs in the marketplace"); *See generally James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir. 1976).

When examined about why he would use a methodology that has been criticized, Dr. Rappeport explained that the judges who were critical of him were wrong and that he was in the process of authoring a chapter in a book in which he would explain the correctness of his "scientific" method and the untenability of the various judges' rulings. (Dize Decl., Exh. A at 34-36, 47-48, 82).

Plaintiff submits that Dr. Sarel's survey, using a methodology that has been approved by judges, should be relied upon by the Court.

4. **Dr. Sarel's Survey Tests for Mistaken Identity Confusion**

Plaintiff submits that the Sarel survey is the only survey in this case that tests for "mistaken identity confusion"[10], which occurs when Defendants' product is perceived to be Plaintiff's product. Dr. Sarel explained this scenario in his report: "Consumers may erroneously

---

[10] It is deemed significant that Defendants' expert not only acknowledges that he did NOT test for "mistaken identity" confusion, but also that, if Plaintiff's expert's survey were accepted by the Court, the evidence of likelihood of confusion found by Defendants' expert would be ADDED to the confusion found by Plaintiff's expert. (*See* Dize Decl., Exh. A at 100, line 18 –101, line 6).

12

believe that CAVIA brand wine is the CAVIT brand wine that they have encountered before (through advertising, prior-purchase, prior consumption, word-of-mouth recommendation and other communication venues)." (*See* Defendants' Motion, Exhibit A at 7).

Plaintiff's survey expert, Dr. Sarel, tested for this type of confusion. Defendants' survey expert, Dr. Rappeport, admitted that he did not test for this type of confusion. (Dize Decl., Exh. A at 99). Therefore, the only survey in the case that is relevant to the issue of "mistaken identity confusion" is the Sarel survey. Given this fact, Plaintiff submits that the Sarel survey will be helpful to the Court and therefore should not be excluded.

### 5. Defendants Rely Upon Unsubstantiated Attorney Argument to Attack the Sarel Survey

Defendants have ignored evidence in the record that CAVIT is a well-known, indeed a famous trademark, and have relied solely upon attorney argument in their Motion to contend that it is not. (Defendants' Motion at 2, 7). On the other hand, Defendants argue in their Motion that marks such as AT&T and CELEBRITY CRUISES are famous and that the mark BEL GIOIOSO PIZZA is "a relatively unknown and unpronounceable brand" (Defendants' Motion at 2), despite the fact that there is absolutely no evidence **in the record** that these marks are famous or that Defendants are justified in being so dismissive of the BEL GIOIOSO PIZZA brand. There is no justification for Defendants to ignore the substantial evidence of fame of the CAVIT mark in the record and to rely upon attorney argument alone to conclude that the CAVIT trademark is not capable of being surveyed by the methodology utilized by Dr. Sarel.

### 6. Defendants' Expert Relies Upon Pure Speculation Regarding the Marketplace for Wine in Attacking the Sarel Survey

Dr. Rappeport unabashedly admits: [I]'m not a big expert on wines …"[11] Unfortunately, that doesn't stop Dr. Rappeport from opining on everything from:

    (ii)    what makes a wine "famous;"

    (iii)    what causes wine to sell;

    (iv)    whether the purchase of an inexpensive wine sold in a BOGO (buy one get one free) promotion in a supermarket is a significant purchase.

Plaintiff submits that the Court is better served in assessing the marketplace for wine by relying upon the testimony of industry experts – such as Plaintiff's witness Michael Petteruti, who has been in the wine business for over 40 years, and even Defendants' own witnesses and arguably unbiased third party witnesses, who testified as follows:

    (i)    Plaintiff's witness Michael Petteruti testified that:

        Palm Bay's customer base includes, but is not limited to, unsophisticated consumers who can be easily swayed by impulse buying. (Dize Decl., Exh. B at 101-102);

    (ii)    Michael Dominguez, Defendants' own Rule 30(b)(6) witness, testified that:

        a. CAVIT and CAVIA wines would be competitors for consumers looking for an imported white wine in the $8-$10 range, and for consumers looking for an imported red wine in the $8-$10 range. (Dize S.J. Decl., Exh. H at 231-233);

        b. CAVIT and CAVIA wines would have been competitors during the Publix BOGO promotion due to price point. (Dize S.J. Decl., Exh. H at 128-129); and

        c. Buyers of CAVIA wine during the Publix BOGO promotion were not sophisticated purchasers and included impulse buyers. (Dize Decl., Exh. C at 130, 168);

---

[11] Dize Decl., Exh. A at 149, line 11.

 (iii) Third party witness Ken Schulman testified that:

The CAVIT brand is well known, and indeed famous, due to its level of sales in the marketplace. (Dize Decl., Exh. D at 60-61); and

 (iv) Third party witness Armando Alvarino testified that:

  a. Consumers who purchased CAVIA wine during the Publix BOGO promotion were likely impulse buyers (Dize Decl., Exh. E at 22); and

  b. A consumer might mistakenly buy CAVIA instead of CAVIT due to the similarity of the name. (Dize S.J. Decl., Exh. I at 40-42).

## III. CONCLUSION

In view of the foregoing, it is clear that the Sarel survey and report should not be excluded. Plaintiff respectfully requests that the Court deny Defendants' Motion in all respects.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 18th day of July, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically filed Notices of Electronic Filing.

Date: July 18, 2011

Respectfully submitted,

/s/ Katherine W. Ezell
Robert C. Josefsberg (Fla. Bar No. 040856)
Katherine W. Ezell (Fla. Bar. No. 114771)
PODHURST ORSECK, P.A.
25 W. Flagler Street, Suite 800
Miami, FL 33130
Telephone: (305) 358-2800
Facsimile: (305) 358-2382
rjosefsberg@podhurst.com
kezell@podhurst.com
*Plaintiffs' Liaison Counsel*

/s/ Russell D. Dize
Charles W. Grimes (*pro hac vice* admission)
Russell D. Dize (*pro hac vice* admission)
GRIMES & BATTERSBY, LLC
488 Main Avenue, Suite 300
Norwalk, CT 06851-1008
Telephone: (203) 849-8300
Facsimile: (203) 849-9300
grimes@gandb.com
dize@gandb.com
*Plaintiffs' Lead Counsel*

## SERVICE LIST

**PALM BAY INTERNATIONAL, INC. v. CORK ALLIANCE, INC., d/b/a SOUTHERN VINES, INC. and HORACIO O. PEIRO**

**UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 10-CV-23464-KING/McALILEY**

**Jennie S. Malloy**
jsmalloy@malloylaw.com
**Meredith Frank Mendez**
mmendez@malloylaw.com
**Oliver Alan Ruiz**
oruiz@malloylaw.com
**David Andrew Gast**
dgast@malloylaw.com
Malloy & Malloy, P.A.
2800 SW 3rd Avenue
Miami, FL 33129
Telephone: (305) 858-8000
Fax: (305) 858-0008
*Counsel for Defendants*
*Via E-Mail*