# EXHIBIT A

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF FLORIDA
 2   Case No. 10-23464-CIV-KING

 3   ----------------------------------------X

 4   PALM BAY INTERNATIONAL, INC., CAVIT CANTINA
     VITICOLTORI CONSORZIO CANTINE SOCIALI DEL
 5   TRENTINO SOCIETA COOPERATIVA,

 6                       Plaintiffs,

 7     -vs-

 8   CORK ALLIANCE, INC. doing business
     As Southern Vine, Inc., HORACIO O. PEIRO,
 9

10                       Defendant.

11   ----------------------------------------X`

12                    DEPOSITION

13                        of

14            MICHAEL RAPPEPORT, M.D.

15              NEW YORK, NEW YORK

16               JUNE 29, 2011

17                 10:00 A.M.

18

19   ATKINSON-BAKER, INC.
     COURT REPORTERS
20   (800) 288-3376
     www.depo.com
21
     Nancy Anne Flynn, RPR
22   FILE NO.:  A505D86

23

24

25
```

1

```
 1          NEW YORK, NEW YORK; WEDNESDAY, JUNE 29, 2011

 2                ^        MICHAEL RAPPEPORT,

 3                     having been duly sworn by a Notary

 4                     Public in and for the State of New

 5                     York, testified as follows:

 6                            EXAMINATION

 7  EXAMINATION

 8  BY MR. GRIMES:

 9      Q      Could you state your full name for the

10  record, please?

11      A      Michael Rappeport, R-a-p-p-e-p-o-r-t.

12      Q      And do you have a particular title?

13      A      I'm sorry, you mean my business?

14      Q      Are you referred to as Doctor Rappeport?

15      A      I have a doctorate but I don't use it as

16  a title.  Mr. Rappeport or Mike is fine.

17      Q      We will use Mr. Rappeport.  Did you bring

18  anything to the deposition today?

19      A      Nothing that pertains to you guys.  I

20  have some stuff in here on a tax return I'm filing

21  for a foundation, but are you particularly

22  interested in that?

23      Q      No, not at all.

24      A      Excuse me, I brought this, copies of some

25  stuff you have.
```

5

Michael Rappeport

different papers, articles, cases, I mean lots of

cases, talking about what noise is, what you're

doing with it, what controls are with noises.  It's

an aspect of controls.

Q     What would you have felt that Dr. Sarel

should have done differently in connection with

noise?

A     I made computations and he made

computations.  I think his computations were

incorrectly done.  We can go through them if you

want in detail, but basically it's a question of

what you incorporate in order to get out what you

are trying to do.

Q     Why do you think his methodology was

inappropriate?

A     That's what, that was the heart of my

critiques of him in the first place, which is he is

not doing, he thinks he is doing a memory test but

he is really -- or recognition test, whatever he

wants to call it.  But the fact is, if I expose you

to four ads and I don't tell you what to look for in

those ads and so on, what I am really testing the

way he is doing it is two things.  The first thing

what he is really testing the way he is doing it is

Michael Rappeport

1   Dr. Sarel used?

2       A      Not with just two bottles, and not with

3   those wordings, and -- it's not the overall method,

4   it's not can you use a method in which you show

5   something in one room and then have people look at

6   something in a second room.  I use such methods all

7   the time, so does everybody.  It's the

8   implementation of that method that's wrong, the way

9   he did it.

10          First of all you can't just use two

11  bottles, you can't tell people they are going to see

12  two bottles, give them the two bottles, and then say

13  essentially "Guess which one is closer to the one

14  you saw in the ads," which is what he is doing, even

15  though he doesn't use those words.  You can't just

16  show four ads that way.

17          If he said to people, I am going to show

18  you four ads, the important thing in these ads is

19  the names of the products, concentrate on the names

20  of the products, he would not have gotten anywhere

21  near the same level of confusion he claims to have

22  gotten.  He would have gotten a much lower number.

23  Yet surely that's what actually happens in the real

24  world.

                                                    14

Michael Rappeport

1

2    someone knowledgeable about how wine is purchased.

3    Do you have any basis for suggesting or representing

4    that you have knowledge about how people buy wine?

5        A     Thirty-five years doing market research,

6    talking to marketers, consulting on marketing,

7    giving people advice on marketing.  And beyond that

8    I would say that 99 percent of Americans would have

9    sufficient knowledge to know that nobody buys wine

10   having accidentally or randomly or by direction seen

11   one ad in a magazine.

12       Q     Have you ever done a wine study before?

13       A     Many.

14       Q     Have you every studied the methodology

15   employed by a consumer in making a wine purchase?

16       A     Not in the sense of -- well, I've

17   studied, yes, if you mean what role does a reference

18   play, what role -- yes, I've studied that.  I mean,

19   what role do people use in purchase because they

20   have been referred to the wine by a friend or a

21   friend told them about it or they drank it in a

22   restaurant where they served it?  The answer is yes.

23   If you're asking me have I explicitly done a study

24   of how people purchase wine, the answer is no.

25       Q     Is the purchase of wine ever an impulse

1                          Michael Rappeport

2    purchase?

3         A     Of course.

4               MS. MENDEZ:  Object to form.

5         A     Of course.

6         Q     And if someone were to purchase wine on

7    impulse, would they do the kind of careful

8    consideration that you have been talking about?

9         A     It's two different issues.  One is, do I

10   decide -- as when you say an impulse purchase, what

11   that means to me is I walked into the store, I meant

12   to buy milk, I saw some wine and I decided I'd like

13   a bottle of wine too, that's an impulse.  If you

14   mean impulse, which brand they buy, which is what

15   you're talking about, I think in this case, the

16   answer is it probably is true it's an impulse

17   purchase even by brand; but it is based on some

18   memory, it's not based on I just happened to see it.

19               I don't think people buy wine or for that

20   matter most products, oh, I'm in the store and I'd

21   like some wine.  Oh, that's the first one I see, I

22   will buy it.  They don't do that.

23               If you want to argue that they do, it's

24   not only contrary to common sense, it's contrary to

25   40 years of marketing and so on.  So no, I don't

Michael Rappeport

survey that consisted of three loaded questions

asked in one Baltimore mall.  Rappeport has been

criticized before for his methodology, citing Jared

International Inc. versus Promotion Emotion 826 Fed

SUP 69 at 73-74 (EDNY 1993), and we hope that he

will take these criticisms to heart in his next

courtroom appearance."

Do you remember that criticism?

A    Oh, yes.  Would you like a comment on it?

Q    Sure.

A    Okay.  That criticism, let's go from

openers, one he says as you said in there, that I

did one small study in three places in a mall in

Baltimore.  That isn't true.  It was a national

study which we relied on.

Second of all, that's Judge Posner, two

comments about that:  First, in 1995 appears an

article in Trademark Reporter called The Role of a

Survey Expert:  A Response to Judge Posner, which

happens to be by me.  Now that is a refereed

journal, they don't put in criticisms of appellate

court justices that last 35 pages explaining that he

didn't know what he was talking about, without some

editor looking at it carefully.

Michael Rappeport

1

2          Two, the fact is that the local judge

3  gave me a lot of credit, that's why it was at the

4  appeals court.  That's what he doesn't want to deal

5  with.  Judge Posner, for whatever reason, shoots

6  from the hip.  So we have a second thing happen in

7  that case.  The very next case after that --

8       Q     No, I just want to hear about that case.

9       A     No, it's about that case.  Counselor, I

10 let you finish, let me finish.  I don't ask what you

11 want to hear about, I'm entitled to answer your

12 question.

13      Q     This is obviously very important to you

14 because you feel like as if you've been criticized,

15 right?

16      A     No, of course I have been criticized.

17 This is sixteen years ago.  I've done 500 cases

18 since then.

19           MS. MENDEZ:  Let him finish his answer.

20           Go ahead, Mr. Rappeport.

21      A     I have done five hundred cases since

22 then.  I've made a living at this, a very nice

23 living doing that.  The second thing that happens is

24 in a courtroom in New Jersey a well known judge

25 named Politan, very next case, a lawyer gets up and

35

1                    Michael Rappeport

2    quotes exactly what you just quoted, which is what

3    makes it relevant.  And Judge Politan said, "Who

4    said that about Dr. Rappeport, Counselor?"

5              And the guy says, "Why, Chief Justice

6    Posner of the Seventh Circuit."

7              And Judge Politan is on the record says,

8    "Everyone knows Judge Posner.  Let's go on

9    Counselor."  That's bullshit.  He doesn't say

10   bullshit, but he implies it.

11             You need to do more homework, Counselor,

12   that's the worst case to criticize me on.

13        Q    More than a decade later the same

14   criticisms were still being leveled at you; weren't

15   they?

16        A    Some judges who don't know better than to

17   make such comments make such comments.  It happens

18   once more.

19        Q    Okay.  So the Sixth Circuit Court of

20   Appeals decision in Auto Zone versus Tandy, 2004

21   which can be found at 373 Fed 3d 786, states, quote

22   "Rappeport has been criticized by other courts for

23   the employment of faulty methodologies and the

24   presentation of unreliable results (See Indianapolis

25   Colts versus Metro Baltimore,) with the case cite,

Michael Rappeport

1

2 that I tell the truth.  And I don't believe anybody

3 said any different.

4    Q    But the point is, I just quoted for the

5 record and asked you about two cases in which you

6 were criticized for quote, "employment of faulty

7 methodology" and criticized for "presentation of

8 unreliable results".  Those criticisms aren't

9 directed to whether or not you are cheating, they

10 are directed to whether or not your expertise as

11 brought to the court is valid or not; is that not

12 correct?

13    A    No, they're directed to the fact the

14 court disagrees with what I did.  But it's very

15 interesting, the two cases you cite are both appeals

16 cases and both cases where the district court who

17 heard the whole survey, who heard the whole

18 testimony -- I didn't testify at the appellate

19 courts, they didn't have a chance to ask me any

20 questions.  And as I pointed out on the Posner

21 decision, he literally said, as you read, that we

22 did in one town, three questions.

23        We did a national survey and ninety

24 percent of the report was on a national survey.  It

25 wasn't about that one town at all.  I don't know

47

1                        Michael Rappeport

2    where he got that idea.  But it just wasn't the

3    case, and I think that comes about because in fact

4    he's doing a lot of appellate cases, and he did

5    that.

6              And I will say the Trademark Reporter

7    editors agree with me at least that I had a

8    reasonable argument.  They published a 35 page

9    article called Response to Judge Posner.

10        Q     So is it your testimony that you believe

11   district court judges are receptive to your

12   testimony as an expert?

13        A     Some are, some aren't.

14        Q     Isn't it in fact true that criticism of

15   your work by courts subsequent to what I quoted from

16   continues unabated?

17             MS. MENDEZ:  Object to form.

18        A     I get criticized sometimes, I don't

19   understand, Counselor.  So what.

20        Q     In the Urban versus BCBG case found at

21   511 Fed SUP 2d 482, did not the court, district

22   court judge in the Eastern District of Pennsylvania

23   in 2007 find that your testimony was unpersuasive?

24        A     First of all, I don't remember the case

25   and I'm pretty good about my cases.  Secondly, in

Michael Rappeport

1

2      A      The court had made a decision ten years

3  earlier, same judge, ten years earlier, on

4  essentially the same question.  We were back in

5  court ten years later claiming conditions had

6  changed.  We used a control that we thought

7  reflected the changed conditions.  He didn't.

8  Judges are entitled to make such judgments.  Again,

9  we were very clear on why we did it, we were very

10  clear on what we had done.  I still think we were

11  right, but that's not the relevant issue.

12      Q      And the judge in that case found "Such

13  control (the control you selected) would increase

14  survey noise and artificially diminish the level of

15  confusion."  Correct?

16      A      That's true.  I'm telling you what

17  happened, I know what happened, and one can -- if

18  you want to argue about whether we did the right

19  thing in the survey or we did the right thing or

20  Dr. Sarel did the right thing, I am perfectly

21  prepared to argue.  That's what this type of

22  argument is.  It's not an argument about it's

23  unreliable or anything.  He thinks it was wrong,

24  done incorrectly, he thinks it was wrong for

25  specific reasons.

Michael Rappeport

1

2     standard on false advertising, everybody uses NAD --

3         Q      Sorry to interrupt, time is short.  I

4     want to focus on likely to confusion.

5         A      I would have to go get you cases.  There

6     are lots of such cases.  I wouldn't be in business

7     if there were no such cases.  I have been doing this

8     35 years, I do the most work of anybody in the

9     United States, I think.  I'm not sure.

10        Q      We've gone over some cases today where

11    the courts have specifically commented negatively on

12    your use of these survey cards, correct?

13        A      Not on the survey cards, you only name

14    one case that's about survey cards, if I understand

15    the three cases you talked about, only one that had

16    to do with cards.  The answer is yes, some courts

17    don't like the method, but they may not like the

18    method because they may not come out with the right

19    results from their point of view.

20             Anybody who believes that courts are not

21    to at least some degree results driven when they

22    look at methodology hasn't been in court.

23        Q      Did the court in National Distiller

24    Products versus Refreshment Brands in the Southern

25    District of New York in 2002 comment upon your use

                         Michael Rappeport

1  of survey cards?

2

3       A     I don't remember, that's nine years ago.

4  It's not a case that's normally brought up.

5       Q     Isn't it true that the use of survey

6  cards does not replicate marketplace conditions?

7       A     Nothing --

8             MS. MENDEZ:   Object.

9       A     Nothing, nothing replicates market

10 conditions, you can't, because people know they are

11 in a survey.  The question is, does it predict to

12 how people would behave in the real world?  There is

13 no such thing as replicating market conditions, with

14 one exception, which the courts have favorably

15 commented on, which we pioneered, which is so-called

16 mystery shopper surveys, which we've done, and there

17 I would refer you to the lead case, Lontaishing,

18 L-o-n-t-a-i-s-h-i-n-g, and it's a likelihood of

19 confusion.  These are all likelihood of confusion

20 cases, which we pioneered.  You can also look in

21 McCarthy, he has that whole page on it.  It's

22 Lontaishing versus Koch and Lowey, L-o-w-e-y, I

23 think.

24             Let me say, with the exception of mystery

25 shopper survey where you go in and behave as though

1                    Michael Rappeport

2    What were the brands?

3        Q      Teton Glacier.

4        A      Oh, yes, yes.  Now I remember.  I just

5    didn't know that was National Distillers, okay.  If

6    you would look -- if you want a complete answer you

7    could save yourself a lot of time, that's one of the

8    three cases I talk about in the article in Trademark

9    Reporter.  It explains exactly what I think about

10   the decision in that case and what I think was going

11   on.  And you would save yourself some time because I

12   spend six or seven pages talking about it.

13       Q      Do you recall the methodology you used,

14   was it a two-room methodology?

15       A      If I remember correctly, yes.  I am not

16   opposed to two-room methodology, don't

17   misunderstand.  I am not criticizing Dr. Sarel

18   because he used a two-room methodology, in and of

19   itself; it was the way it was done.  It was the

20   implementation.  I have used a two-room all the time

21   I will be perfectly happy to testify to that.  We

22   use one room, we use two room and we use mystery

23   shopper, and we use totally different methods as

24   well depending on the case.

25                    That's interesting, National Distillers

1                    Michael Rappeport

2    survey question, because that's not going to happen

3    out in the real world.

4            And I spent, I tell you, really if your

5    interest is why I disagree with that judge, or those

6    judges, because there's a sequence of them, look at

7    the article, because I really spent a long time

8    trying to be clear, and the editor spent even longer

9    beating the hell out of me, making me clear.

10       Q     But isn't it true that as someone who has

11   been involved in all these cases that that's what

12   judges are looking for, is for surveys to replicate

13   "marketplace conditions"?

14            MS. MENDEZ:  Object to the form.

15       A     And I keep trying to convince them, and

16   others, not just me, I mean, I don't want to name

17   specific people because I put them on the spot, but

18   I know half a dozen others who keep trying to

19   convince judges, that's not what the game is about.

20   The game is about replicating how people will behave

21   in market conditions.  By definition we recognize

22   that by saying the correct result is net of noise,

23   because noise is something that occurs because you

24   are in a survey, not in market conditions.

25       Q     Do you believe that there is anything

Michael Rappeport

1

2  twenty or more is real evidence of likelihood of

3  confusion, legally meaningful likelihood of

4  confusion.

5          Even that breaks down at some point, and

6  I'll show you a context.  If what you are talking

7  about is the trade dress of pharmaceutical pills

8  that old people take, courts won't accept twelve

9  percent, they might accept otherwise, or ten percent

10  they might accept if we're talking about toothpaste

11  brand, because they're saying the harm done from

12  mistake is so great that we're going to insist on a

13  lower number.  But that's the exception that proves

14  the rule, really.

15          And generally speaking zero to ten, no

16  confusion; eleven to nineteen grey area; twenty or

17  more confusion.

18      Q      And your survey did not attempt to test

19  mistaken identity, correct?

20      A      I have agreed that it's not a mistaken

21  identity test.  How can it be when I show them both?

22  That criticism by Dr. Sarel, I don't disagree with,

23  I think he is correct, I didn't do mistaken

24  identity.  The problem is I don't think he did it

25  either.  Because I think it's much more complicated

Michael Rappeport

1  to do, precisely because you have to understand what

2  other knowledge people have than that, and then you

3  have to understand whether the way he did it for

4  somebody who has no other knowledge would in any way

5  replicate what would happen in the real world, not

6  marketing, but what would happen in the real world.

7          And now we're back to burden of proof as

8  I said earlier, if both were getting thrown out you

9  guys lose from my point of view.  That doesn't mean

10  the judge will make you lose, I think you lose.

11      Q     And if the judge were to find that both

12  surveys were worthy of consideration, for him to

13  assess the total likelihood of confusion he would

14  have to add Sarel's confusion from the mistaken

15  identity to your confusion, which tested other types

16  of confusion, correct?

17      A     I don't think it's strictly additive

18  because some of the same people may confuse both

19  ways.  I mean, we know that, that I know from lots

20  of surveys.  Even his survey, my guess is, that

21  shows up.  I don't think it's purely additive, it's

22  some, it's more than either one but not necessarily

23  as much as both combined.  I mean, almost certainly

24  not the same as both combined because some are bound

100

Michael Rappeport

1
2  to do both just statistically.  But in fact if he

3  credited, totally credited both surveys, had no

4  problems, you guys would have a fairly strong

5  argument that there is real confusion, in my

6  opinion.

7      Q      When you organize your file, how do you

8  generally do it?

9      A      I don't follow you.

10      Q      Do you have a numbering system, do you

11  use a lettering?

12      A      We number every case in as we get it.  We

13  are up to 804.  I have got another numbering for

14  political studies and policy studies and other

15  things we do.  But we number each case in when

16  somebody agrees to pay us some money.  That is when

17  they just talk to us it don't count.  But once

18  they've agreed to pay us some money, whatever that

19  is, we number them in.  We are up to 804 litigation

20  case.  Our files however are organized by law firm

21  because it's much easier to find stuff that way.

22      Q      So the law firm files, how do you

23  organize those?

24      A      I have a file like this (indicating), but

25  I showed you for each case, and the law firm thing

101

Michael Rappeport

1

CONTINUED EXAMINATION

2

BY MR. GRIMES:

3

4      Q       Mr. Rappeport, you indicated in your

5  survey report on page three of the methodology intro

6  that it is important to, quote, "Replicate actual

7  market conditions."  Specifically you said that

8  "There is a desire to replicate actual market

9  conditions and that it is therefore important to

10  keep in mind" -- I guess that's it, after conditions

11  period.  Strike the rest.

12              So that's an accurate statement obviously

13  because it's your statement, correct?

14      A       I hope so.  I mean clearly from the

15  discussion we had earlier, what I mean by market

16  conditions is how people would behave in the market.

17  Maybe I need to start making that clearer now that

18  we had this discussion.

19      Q       You used these six cards that we have

20  been talking about prior to lunch to show different

21  brands of wines, correct?

22      A       Yes, sir.

23      Q       And did the brands as they appear on

24  those cards replicate the way in which the brands

25  appear in the marketplace?

Michael Rappeport

1

2     A     No, brands appear in the marketplace both

3  with a name some places, this will be an

4  advertisement or a section of a store that just has

5  a name, but mostly they appear as labels obviously.

6     Q     And do brands sometimes have an attendant

7  design?

8     A     You mean the name itself or the rest of

9  the thing that goes on the label?

10     Q     Like, Duracell battery, is there anything

11  unique about Duracell battery besides the name

12  Duracell?

13     A     How it's presented, the packaging?  I'm

14  not sure what you are talking about.

15     Q     Yes, is there anything else --

16     A     Wines are packaged in with labels that

17  are each different.  Actually if I put in labels

18  that were different I would have gotten lower levels

19  of confusion, not more.

20     Q     Why?

21     A     Because there would be more reason to

22  think they would be different with all these clues

23  saying they are not the same.

24     Q     And what were some of the clues that

25  would say for example that Cavit and Cavia were

142

Michael Rappeport

1

2    But for example, if I showed labels and

3 two or three of these were Italian wines as at least

4 a couple of them are, and Cavia is Argentine, that

5 would tend to reduce the confusion quite clearly

6 between Cavia and Cavit; you would be more likely to

7 pick two Italian wines, I would think, as being the

8 same wine, same place.  You wouldn't think that the

9 same company using the same name produced an Italian

10 wine and an Argentine wine.

11    At least I'm not a big expert on wines,

12 but I wouldn't think that from my knowledge of

13 wines.  Companies tend to produce wines from a

14 single country.  We've done a lot of work actually

15 for Canondaga which is now they've changed it to

16 some more generic name, and they produced wines in

17 about eight or ten different countries but they use

18 a different brand for each place, because that seems

19 to be consistent with...

20    One of the questions you asked me this

21 morning was about whether I had done work with other

22 wines, and yes, we've done work with Canondaga.

23   Q If in fact evidence were to show that

24 there is a recent, I don't know if phenomenon is the

25 right word, but a recent tendency of wine companies,

Michael Rappeport

1
2  guessing.

3          It's the same, even though done I think

4  totally inadequately, for putting in Catina.   Why

5  you put in Catina, why should you put in something

6  as close to Cavit as possible, which I don't think

7  he does in Catina, and the answer is because you are

8  trying to find out how many people are guessing when

9  they connect Cavia and Cavit in the sense that they

10 wouldn't have that same reaction in the real world.

11 Because it's real world you are trying to replicate,

12 and to replicate real world, you have to know the

13 sum of real world confusion plus guessing and then

14 subtract out the guessing.

15          That's what controls are about.   You get

16 a sum of that for this, for Cavia and Cavit, you get

17 the sum of real world confusion plus guessing; for

18 Arvo and Avia or similar kinds you get just

19 guessing, you subtract that from Cavit and Cavia and

20 you get real world confusion.   Estimate, nothing is

21 perfect.

22     Q     How do you know that someone who thought

23 Avia and Avie were confusing would, when they select

24 Avia and Arvo are just guessing; how do you know

25 that?

171

Michael Rappeport

1

2       that's not in the marketplace, and if it's really de

3       minimus, you can't ask that question at some level,

4       or you can ask it, if there is a suit, but if

5       there's no suit the guy can say we're not bothering

6       because it costs 2 million dollars to sue and we'll

7       gain $37.40.

8            Q       So in that situation, it's not in the

9       marketplace yet or it costs too much and we will

10      gain $2.30, how do you as the survey expert decide

11      whether or not nevertheless to include that name as

12      a control in your survey?

13           A       You make a judgment, you do the best you

14      can.  I mean it's flattering, you keep acting like

15      this is science.  I am trained originally as a

16      physicist.  If you ask me what happens when you

17      raise the temperature of an enclosed body of fluid

18      by X degrees, I will give you a formula.

19                   These are not formulas.  There is

20      judgment involved.  I am not arguing there is no

21      judgment involved.  I try and make those judgments

22      from the point of view of my client, that is, I try

23      not to do things that clearly are favorable to my

24      client.

25                   Do I always succeed?  No, obviously some

203

Michael Rappeport

1

2        A       Yes.

3        Q       -- to address this issue --

4        A       Yes.

5        Q       -- whether or not some of the people who

6    either had no opinion or who said they were all from

7    different companies were, more of them came from

8    this questionnaire versus the questionnaire where

9    the order was reversed?

10       A       Technically is, was there an order bias?

11   We did look, we didn't see any.  You are welcome to

12   look as well.  We have given you enough data so you

13   can look at it.  But the answer is we didn't see

14   any, and we would have been really surprised with

15   this two category answer if we did see.

16       Q       Are you aware that defendant's witness

17   Mr. Dominguez testified that the cards you used in

18   the survey did not replicate how the brand appeared

19   in the marketplace?

20               MS. MENDEZ:  Objection to form.

21       A       Yes, I am aware -- no, I'm not aware that

22   he said it, but I am aware they don't replicate how

23   the brands appear in the market.

24       Q       When you said to the respondents on

25   Rappeport page six, you instruct all your

Michael Rappeport

1

2     A      That's what I just said, add more noise,

3     I help my client and not yours, which is one reason

4     we didn't do it.  Not the only reason, but one

5     reason.

6          Q      You had indicated that Sarel's report

7     would have been acceptable if the ability to recall

8     the name had been shown, and I believe you indicated

9     that that can be done in two ways.  Let me see if I

10    can tell you where this is.  It's in the back of

11    your report.  Page number --

12               THE WITNESS:  In the back of the report

13         there's an appendix --

14         Q      On page two of Sarel's report, I mean on

15    page two of your appendix E, commentary on Sarel's

16    survey.

17         A      Right.

18         Q      You talk about the two cases in the

19    first -- actually second full paragraph, "For

20    practical purposes, you can provide an analogous

21    situation to the level of attention ordinarily paid

22    by observers of a crime."  Do you see that?

23         A      You left out three critical words,

24    "Survey conditions may provide," i.e., it's not up

25    to Sarel to provide it, both these ways are out of

Michael Rappeport

1   Sarel's control.

2        Q      Right, so the first way is that the

3   initial brand name is already well known.  We've

4   talked about that, that's an issue, whether or not

5   Cavit is well known or not?

6        A      Yes.

7        Q      And the second way that you indicate here

8   is, which is in the next paragraph, is, starting

9   with the third line, "For a purchase to be of such

10  low importance that even a small exposure comes

11  reasonably close to how a particular brand would be

12  purchased in the real world."

13            Do you see that?

14       A      Yes.

15       Q      You then went on to say that in your

16  experience, "In the real world choosing one among

17  the many available brands of wine is a reasonably

18  significant purchase, which clearly does not meet

19  this criterion."

20            Why do you say that?

21       A      Because it's true of almost every

22  product, people think a little bit about almost

23  every brand they buy of almost everything; it's even

24  true of candy bars.  Wine is of sufficient

243

Michael Rappeport

1
2   importance that when people buy it and people think

3   there is enough -- one thing I do know, they think

4   there is enough difference between brands between

5   particular bottles of wine that it's a different

6   experience to get different bottles of wine.  Not

7   exactly the same.

8         It's not like, one of the few places for

9   example we think wouldn't meet that criteria might

10  be toothpaste, because people really think

11  toothpaste is the same, we've done enough work

12  recently to believe that.  But even there it might

13  not be true.  In general people -- I'm not asking

14  for a whole lot of thought about it, thirty seconds

15  in front of various wines would almost meet this

16  qualification.

17        It's just not hey, I don't give a damn

18  about which brand I get, I'll just go pick up the

19  first white wine I see.  That's not how wine is

20  bought, my opinion.  If I'm wrong Sarel has to prove

21  I'm wrong.  Once again, it's possibly true, I think

22  it's not true but evidence is required, you can't

23  simply make the claim that people walk in the store

24  and there's forty white wines, they just pick up the

25  first white wine they see, because they're all the

Michael Rappeport

He wants not to call attention in order
not to tell them what it's about, and get one kind
of answer. And he wants to call attention, I mean
not call attention, he wants to both call attention
and not call attention in order to do this.

I'm frankly not sure it's possible,
mistaken identity for something of as limited
visibility as this. I started thinking about other
wine brands I know aside from Kendall Jackson and if
you want some more wine brands. Kendall is Kendall
Jackson really, and I left out the one brand that I
think everybody would know which is Gallo.

You could do his study on Gallo without
any ads, if they were suing somebody for mistaken
identity, somebody who came along and called it
Galeo, or whatever, you could do it because you
could depend on the fact that virtually everyone had
heard of Gallo.

Q     Why are you so certain that everybody has
heard of Gallo?

A     Because we have done wine studies, and
I'll tell you something, we've asked who they have
heard of and Gallo is very high among wine drinkers.

Q     Gallo would be the kind of brand that you

Michael Rappeport

1

2    think his survey could have been conducted in

3    connection with for mistaken identity purposes?

4        A      Then he wouldn't need to bother with the

5    four ads, he just could go right to which of these

6    is, you know, which of these is Gallo?  Or he could

7    do the four ads, yes.  At that level of familiarity

8    he has some shot at it.  Even there, I would

9    certainly assume he put in a question to prove at

10   the end that people have heard of Gallo.  But he

11   could do his study with Gallo and my guess is I

12   would have a lot more faith in the answers.

13       Q      Toothpaste, is there anything else

14   besides toothpaste that you think qualifies for this

15   sort of, not a reasonably significant purchase kind

16   of situation so that his type of study would work.

17       A      Actually better than toothpaste.  No,

18   that's not -- I still would have problems with his

19   survey because of the choice of just two and so on,

20   all right.  But the general structure would probably

21   work better even still for vitamins, because there

22   are six vitamin things in the store and I don't know

23   anything about the difference between them, I just

24   know there are a bunch of vitamins.

25              And then he would have to give the